221 So.2d 223 (1969)
Michael J. O'SHEA, Appellant,
v.
Mildred F. O'SHEA, Appellee.
No. 1447.
District Court of Appeal of Florida. Fourth District.
March 26, 1969.
Rehearing Denied April 29, 1969.
*224 R. Regis Reasbeck and R.J. Fegers, of Reasbeck, Fegers & Reasbeck, Hollywood, and Robert V. Parker, of O'Connell & Cooper, West Palm Beach, for appellant.
Edward G. Stephany and John D. Mendez, Fort Lauderdale, for appellee.
*225 WALDEN, Chief Judge.
This is an appeal by the husband from a portion of a final decree of divorce. It is aimed only at the provisions which awarded all jointly held property to the wife. The challenged decretal language was:
"It appearing to the Court that this 36 year old Defendant, MICHAEL J. O'SHEA, did deliberately design to acquire and take the property of this 66 year old Plaintiff, MILDRED F. O'SHEA, to his own use and benefit, and that said Defendant has contributed no moneys to the support of the parties nor brought any property into the marriage and, on the contrary, that all support of the Plaintiff and Defendant has been furnished from the separate property and income of the Plaintiff.
"And it further appearing to the Court that the following described personal property stands in the joint names of the Plaintiff and the Defendant and that said property was owned individually by the Plaintiff, prior to the marriage of the parties on June 9, 1966:"
(An apartment lease, a brokerage account and a check issued from the brokerage account were then described.)
* * * * * *
"ORDERED and ADJUDGED that the Plaintiff shall take the above described property as her separate property and that all title and interest of the Defendant therein is divested out of him and is vested in the Plaintiff. * * *"
We reverse and hold that the parties should instead be deemed tenants in common as to this property.
It cannot be gainsaid that this was indeed an unusual union. The differences in age, background and assets made it so. But these differences, without more, do not constitute grounds for a judicial return of these properties to the wife. This is true even though their arrangements may be somewhat repugnant to our mores and sense of chivalry.
The wife is 66 years of age while the husband is 36 years of age.
The wife prior to marriage to this husband was a wealthy widow. The husband was an impecunious steamfitter and welder whose trade was capable of producing average weekly wages of $225.00.
After a close and intimate acquaintance of about one year the parties were married for the first time in February 1966. At the wife's behest the parties were divorced in May 1966, for the first time. In June 1966, the parties were again married. The second divorce decree which is here on appeal was entered in April 1967, with the wife again denominated as plaintiff.
At the first separation and subsequent divorce the husband took a negligible sum of money and none of the wife's assets and traveled to Michigan in order to obtain work in his trade. Some time and several telephone conversations later the husband returned to Florida and resumed cohabitation with the wife.
The parties agreed to remarry, but each exacted conditions from the other. The husband insisted as a condition of remarriage that the wife put her property in their joint names,[1] a proposition with which she agreed because "that is the way it should be, because of a marriage being *226 happy it has to be a fifty-fifty proposition." In return, the husband agreed to remarry the wife and to give up his job in Michigan, working henceforth only out of Fort Lauderdale.
Subsequent to their remarriage, the wife transferred her individual stock brokerage account and the proprietary lease to her apartment into the joint names of herself and the husband. She also opened a joint checking account into which she made substantial deposits. She admitted that these acts were done in furtherance of their agreement.[2] With specific reference to their stock account, she acknowledged the voluntary nature of the transfers.[3]
Both parties have asserted the existence of an oral antenuptial agreement. In fact, this agreement was first injected into the cause in the wife's complaint wherein she alleged, "[i]mmediately following the marriage and as a condition imposed by the Defendant for the marriage, the * * * property was placed * * * in the joint names of Plaintiff and Defendant."
The marriage itself would have been sufficient consideration to support the agreement.[4] But in addition this agreement was supported by the husband's counter-agreement to work only out of Fort Lauderdale, as demanded by the wife.[5]
Although antenuptial agreements fall within the statute of frauds,[6] partial performance is normally sufficient to remove the transaction from the operation of the statute. The testimony in this case is uncontradicted that the agreement was fully performed. Mrs. O'Shea voluntarily made her husband joint owner of her brokerage *227 account, apartment lease and checking account. In return he remarried and sought work only in the Fort Lauderdale area, devoting his time in large part to successful dealings in their stock where approximately $13,600.00 in profits were realized in seven months.
Since the antenuptial agreement was fully performed, the trial court erred in denying effect to the agreement.
But there is still another reason why the order appealed must be reversed insofar as it purports to restore all of the wife's erstwhile property to her individual ownership. The testimony is uncontradicted that Mrs. O'Shea voluntarily conveyed to her husband joint ownership of her stock brokerage account,[7] her bank account[8] and her long term apartment lease.[9]
Even though a husband has not the benefit of a presumptive gift when he receives property from his wife,[10] the husband here has carried his burden, largely through the wife's own testimony, of showing that she intended to voluntarily transfer one-half interest in her assets to her husband.[11] The wife nowhere has claimed the transfers to be loans. Nor has she testified that the transfers were other than voluntary.
Negatively, there is no evidence of fraud, coercion, or incompetency. It is clear from the candid testimony of the wife that she knowingly and willingly transferred this property into her husband's name. This was done in the light of the history of the parties and with the transfers requiring several steps over an appreciable period of time, all of which negates any idea of temporary or rash impulse. She had opportunity and means to seek counsel had she wished to do so.
All and all, it is difficult to understand the legal theory upon which the wife bases her claim for recovery. Her complaint gives no hint except the recital in the prayer where she seeks lump sum alimony *228 and special equity. Patently, she is not entitled to alimony.
Is there a basis for finding a special equity in this property which would warrant the court in unmaking the earlier unqualified and completed gift and rescinding he performed antenuptial agreement? The answer is "no." The property was validly conveyed to the husband in June 1966. Suit was filed in February 1967. The record during the intervening period contains no basis for a finding of such special equity.[12] She knew his employment situation and it was at her instance or requirement that he remained in Fort Lauderdale where employment possibilities for his trade were nil. He successfully traded in stocks and, except for her claim of cruelty, the parties acted out their expected roles. Apart from the stock profit accounted for by the husband's efforts, none of the contested property was accumulated during the marriage course.
We summarize by holding that the transfers of property to the husband are completed gifts or conveyances per valid antenuptial agreement.
The decision of the trial court as to the matters appealed is reversed with instructions to decree the parties as tenants in common[13] as to the apartment lease, checking account and brokerage account. Since the husband now holds a check for $75,621.93, payable to both the husband and wife as proceeds from the sale of stock, this amount shall be considered part of the brokerage account on remand.
Reversed.
OWEN, J., and DOWNEY, JAMES C., Associate Judge, concur.
NOTES
[1] As he testified, "* * * `Well, Mildred, before we could ever get remarried again,' I says, `50 per cent of all your stocks or everything you own, 50 per cent of that has to be mine.' I says, `then I know in two months time or three months time you won't be kicking me out again or I wouldn't be kicking you out again.'"
[2] She testified that her intention in putting the properties into their joint names was: "A happy marriage, which I always figured was a fifty-fifty proposition.

"Q. All right. Had there been any discussion between you and your husband prior to your putting these properties in joint names?
"A. He wanted it.
* * * * * * *
"Q. (By Mr. Mendez) Why do you say that was something he wanted?
"A. Well, he said that when we went back together that would be the way it would be. And I said that it is the way it should be, because of a marriage being happy it has to be a fifty-fifty proposition.
* * * * * * *
"Q. And this was your sole reason then for putting the properties into joint names?
"A. That is the only reason I had."
[3] She was asked:

"Q. Now, Mrs. O'Shea, in the first marriage you didn't transfer the stock to your joint names, did you?
"A. No, sir.
"Q. But you did in the second marriage because that was your agreement; am I correct?
"A. Yes, sir.
"Q. You did agree this with him prior to the marriage, that this would be done; is that right?
"A. We agreed, yes, sir.
"Q. And then after the marriage you fulfilled this? You transferred it, as you said you would; is that correct?
"A. Yes, sir.
* * * * * * *
"Q. And you did that voluntarily; is that correct?
"A. Yes, sir."
[4] Scoville v. Scoville, Fla. 1949, 40 So.2d 840; Ray v. Ray, Fla. 1950, 44 So.2d 286.
[5] The husband was asked:

"Q. All right, and did she impose any conditions to you as far as 
"A. That I couldn't be running all over the country working. And I wanted to be up in Michigan that summer for awhile, working."
The wife corroborated this when she was asked:
"Q. Now one of the things, Mrs. O'Shea, when he came down in June, before your marriage, was one of the things that you wanted, too, was that he would not travel on his job, and work here locally?
"A. That is right."
[6] Section 725.01, F.S. 1967, F.S.A.
[7] She was asked what conversation had been held with her husband concerning the stock. She replied: "That it was going to be transferred into a joint account.

"Q. And then after the marriage you fulfilled this? You transferred it, as you said you would; is that correct?
"A. Yes, sir.
* * * * *
"Q. And you did that voluntarily; is that correct?
"A. Yes, sir."
The stock broker was asked if he had discussed the transfer with Mrs. O'Shea. He replied; "Well, Mrs. O'Shea and Mr. O'Shea came in the office together. Mrs. O'Shea had the certificates. She endorsed them in my presence and they were put into the joint account with the understanding that they were going into the joint account. I pointed out that any checks that were drawn on a joint account would naturally be drawn payable to both parties, both signatures would be required. If any securities were withdrawn from the account the certificates would be registered in both names and would have to be signed by both parties in order to negotiate them."
[8] Mrs. O'Shea was questioned:

"* * * Did you call up the bank and make an appointment to set up that bank account?
"A. We both went in.
"Q. Yes, but who called up and made the appointment?
"A. I don't recall whether it was Mr. O'Shea or myself.
"Q. And you both went in and you signed the bank account?
"A. We certainly did."
[9] Asked if, after her marriage, she had caused her apartment lease to be placed in joint ownership, she replied:

"A. I did.
"Q. And this is an assignment of your original lease, is it not?
"A. Uh-huh."
[10] Allen v. Allen, Fla.App. 1960, 123 So.2d 355.
[11] Compare Olsen v. Olsen, Fla.App. 1967, 195 So.2d 864, wherein the husband failed to meet this burden.
[12] In Tanner v. Tanner, Fla.App. 1967, 194 So.2d 702, the court noted that there are two circumstances under which an award may be made based on special equities. First, where the wife has contributed financially to the husband's business or acquisition of property; and second, where her personal services contributed materially to the husband's acquisition of property. See also Roberts v. Roberts, Fla.App. 1958, 101 So.2d 884, which infers that these are the only two circumstances in which such an award can be made.
[13] Section 689.15, F.S. 1967, F.S.A.