[No. 50884-9-I. Division One. February 3, 2003.]

*In the Matter of the Marriage of* CARLA M. DEWBERRY, *Respondent*, and EMANUEL E. GEORGE, JR., *Appellant*.

352

Kenneth W. Masters and Charles K. Wiggins (of Wiggins & Masters, P.L.L.C.), for appellant.

Catherine Wright Smith and Brendan F. Patrick (of Edwards, Sieh, Smith & Goodfriend, P.S.), and Mary Wechsler (of Wechsler Backer, L.L.P.), for respondent.

COLEMAN, J. — At issue in this dissolution case is whether an oral prenuptial agreement to treat income earned during marriage as separate property is enforceable. Because the trial court found by clear, cogent, and convincing evidence supported by the record that the parties fully performed their separate property agreement during their marriage, we conclude that their oral prenuptial agreement is enforceable. The trial court did not err when it characterized the parties' property acquired during marriage as separate property in accordance with the agreement. In addition, we conclude that the trial court did not abuse its discretion by allocating the parties' separate property to the spouse who acquired it. Accordingly, we affirm the trial court's property division. We also affirm the order of child support.

## FACTS

Emanuel George, Jr., and Carla DewBerry started dating in 1980 while they were both living in California. DewBerry had just graduated from Boalt Hall School of Law and was working toward becoming a CPA at Arthur Andersen. George was a college-educated music industry executive.

In 1981, the parties were discussing marriage and George told DewBerry that, because a friend had been wronged in a divorce settlement and lost his house, he insisted on the

following conditions of marriage: (1) DewBerry would always be fully employed, (2) each party's income and property would be treated as separate property, (3) each party would own a home to return to if the marriage failed, and (4) DewBerry would not get fat. DewBerry agreed to these conditions. This discussion took place in California, a community property state. Neither party was particularly wealthy at the beginning of their relationship. George and DewBerry married in 1986.

Between 1981 and 2000, George and DewBerry continually affirmed this agreement through words and actions. The record reflects painstaking and meticulous effort to maintain separate finances and property. During their marriage, DewBerry and George deposited their incomes into separate accounts which they used for their personal expenses and investments. In 1990, after the birth of their first child, they opened a joint checking account in order to handle certain agreed household expenses. George and DewBerry deposited a specified amount to the joint account, and they reimbursed their personal accounts from the joint account if they happened to use personal funds for household expenses. They took turns managing that account. By 2000, when George and DewBerry separated, they had accumulated minimal community property in the form of joint accounts and jointly purchased possessions. They held numerous investment, bank, and retirement accounts as individuals, and the spouse who had created and contributed to those accounts was considered the sole owner and manager of the assets in those accounts. The primary beneficiaries of their individual accounts were the parties' children, or alternatively, the estate of the spouse who funded them.

During their relationship, DewBerry purchased three houses as her separate property, securing financing separately in all instances by signing promissory notes or asking her sister to cosign. The first house that she bought was a duplex in Oakland, which she purchased in 1982 in order to fulfill the third condition of the prenuptial agreement. The

latter two houses, both located in Seattle, served as the family's primary residences. In accordance with the parties' agreement, DewBerry treated these houses as her separate property by paying for maintenance, improvements, and the down payment and mortgage with funds from her separate accounts. George paid DewBerry a set amount each month toward living expenses, such as utilities, and DewBerry repaid George for any maintenance costs he incurred. The only involvement George had with these properties was to sign documents at various times indicating either that he had no interest in the properties (the Oakland duplex and the first family home), or, in the case of the parties' most recent residence (the Thorndyke house), that he consented to being listed on the purchase documents as husband and wife per the bank's requirements. There was no intent that George be personally liable, however, for any of the indebtedness on the properties. George already owned real property in Texas and California that he had acquired before their marriage.

In 1985, DewBerry left Arthur Andersen to become an associate in a Seattle law firm. Meanwhile, George worked in sales and marketing in the entertainment and hospitality industries, and his salary was comparable to DewBerry's initial law firm salary, around $40,000 to $50,000 per year. By the 1990s, however, after DewBerry became a partner at her law firm, her annual salary increased rapidly, totaling over $1 million in 2000. Meanwhile, George's salary remained constant in the $40,000 to $50,000 range. Both parties worked full-time while sharing parenting responsibilities for their two children.

The trial court entered detailed findings of fact and conclusions of law regarding the parties' property and oral prenuptial agreement. Specifically, the trial court found by clear, cogent, and convincing evidence that the parties had entered into an oral prenuptial agreement, despite George's denial of the agreement's existence. The trial court also found that there had been "complete performance" of that agreement during the parties' marriage and, thus, the

parties' property consisted primarily of separate property. The trial court ordered that the parties' property be divided roughly in accordance with its status as separate or community property. It awarded DewBerry $2.3 million, or approximately 82 percent of the parties' property, which consisted almost entirely of real and personal property that DewBerry had acquired during the marriage, as well as her premarriage separate property. George received property worth $600,000, consisting of his real and personal separate property from before and during the marriage, the bulk of the parties' community property, plus $300,000 cash from DewBerry's separate accounts. Part of the trial court's award to George consisted of a cash equivalent of 11 percent of the Thorndyke house value, or $74,250, based upon evidence of some commingling of property interests in the Thorndyke house (i.e., George's possible liability on the mortgage, his reliance on the house as a primary residence, and traceable community funds used for the down payment).

The trial court also found that George was voluntarily underemployed because he had not worked full-time hours from January 2000 through September 2001, the time of trial. After he was laid off from Eddie Bauer in 1999, George began working the early morning shift from 4 A.M. to 7 A.M. at UPS because it provided steady income and benefits. It also allowed him flexibility to pursue a career as a longshoreman and spend time with his children. The longshoring work was assigned on a daily basis at a dispatch hall, but because George lacked union membership and senior status, he worked only one to two shifts per week. The trial court ordered George to pay child support based upon imputed income of $48,000, which is more than he currently makes in his part-time jobs, but which is less than his salary at Eddie Bauer. George appeals the trial court's property division and the order of child support.

## DECISION

George argues that the trial court erred when it found by clear, cogent, and convincing evidence that an oral separate

property agreement had been made by the parties prior to marriage and that it had been fully performed during their marriage, making it an enforceable agreement. He claims that such an agreement is void under Washington's community property laws and the statute of frauds. He also disagrees with the trial court's conclusion that "almost all of the property the parties own is separate property and it should be awarded to the person who obtained it." We find no error and affirm.

█ There is nothing in Washington law that prohibits parties from entering into prenuptial agreements that alter the status of community property. Furthermore, there is substantial evidence to support the trial court's findings and conclusions regarding the existence and complete performance of the parties' oral prenuptial agreement. Thus, the part performance exception to the statute of frauds applies and the parties' oral agreement is enforceable.

Oral separate property agreements made *after* marriage have consistently been enforced by Washington courts when clear and convincing evidence shows both the existence of the agreement and mutual observance of the agreement. *See, e.g., Gage v. Gage*, 78 Wash. 262, 138 P. 886 (1914) (holding that wife could pursue her wage claim as her separate property); *Union Sec. Co. v. Smith*, 93 Wash. 115, 160 P. 304 (1916) (insulating wife's separate earnings from husband's creditor); *In re Estate of Janssen*, 56 Wn.2d 150, 351 P.2d 510 (1960) and *Togliatti v. Robertson*, 29 Wn.2d 844, 190 P.2d 575 (1948). *See also In re Estate of Martin*, 127 Wash. 44, 49, 219 P. 838 (1923) (noting enforceability of oral separate property agreements made between spouses).

But Washington courts have not yet addressed a situation where parties have orally agreed *prior* to marriage to have a separate property agreement during their marriage. Accordingly, this is a matter of first impression, and we address both the statute of frauds and Washington law concerning prenuptial agreements.

The statute of frauds requires certain agreements, including agreements made in consideration of marriage, to be in writing. RCW 19.36.010. Failure to put such agreements into writing renders them void. *Koontz v. Koontz*, 83 Wash. 180, 184-85, 145 P. 201 (1915), *reversed on other grounds, In re Estate of Burmeister*, 124 Wn.2d 282, 877 P.2d 195 (1994). In *Koontz*, the husband's heirs alleged that his surviving spouse had orally agreed prior to marriage that she would not claim any interest in her husband's estate. *Koontz*, 83 Wash. at 184-85. The Washington Supreme Court held that any such agreement, if made orally, would violate the statute of frauds and declined to enforce the agreement. *Koontz*, 83 Wash. at 184-85. The alleged agreement took effect only upon the husband's death; thus, there was no performance during the parties' marriage.

The statute of frauds also barred enforcement of an alleged separate property agreement in *Graves v. Graves*, 48 Wash. 664, 94 P. 481 (1908). In *Graves*, several years after a husband and wife had divorced, the wife claimed that she was a co-owner of a parcel of real property that was acquired during marriage, but which was not disposed of in the parties' dissolution decree. The ex-husband contended that he and his ex-wife had entered into an oral agreement to treat each spouse's property as separate property; thus, he was the sole owner of the parcel in question because he purchased it in his name. The husband conceded, however, that community funds were used to purchase the property, and the court found that the wife had continuously asserted that the property was jointly owned. Thus, the alleged oral prenuptial agreement was void under the statute requiring agreements in consideration of marriage, as well as agreements transferring an interest in real property, to be in writing. *Graves*, 48 Wash at 667.

█ DewBerry contends on a number of grounds that the statute of frauds does not apply to the agreement in question here, but the cases she cites do not support her arguments. First, this agreement is not an example of mutual promises made in contemplation of marriage. The

case DewBerry cites, *In re Marriage of Fox*, 58 Wn. App. 935, 939, 795 P.2d 1170 (1990), which stated in dicta that "antenuptial agreements made upon mutual promises to marry" do not require a writing, is not on point. *Fox*, 58 Wn. App. at 939. Although there are mutual promises involved here as there are in any contract, DewBerry and George's agreement is an agreement made in consideration of marriage. *See Koontz*, 83 Wash. at 184-86. But for DewBerry and George's marriage, there would be no reason to have a separate property agreement and, by the terms of George's conditions, without the agreement, there would have been no marriage. Thus, it is an agreement in consideration of marriage.

Second, DewBerry relies on *Brock v. Button*, 187 Wash. 27, 59 P.2d 761 (1936) for her argument that a prenuptial agreement that can theoretically be performed within one year does not fall within the statute of frauds. But *Brock* did not involve a prenuptial agreement. The agreement in *Brock*, which was held to be unenforceable under the statute of frauds, consisted of mutual promises to marry no earlier than three years after the promises were exchanged. As discussed above, DewBerry's and George's agreement does not consist of mutual promises to marry. Here, the writing requirement for agreements made in consideration of marriage applies, regardless of whether the marriage lasts six months or six years. RCW 19.36.010.

■ Although we hold that the statute of frauds applies to the agreement in question, we conclude that it is enforceable under the part performance exception to the statute of frauds. The doctrine of part performance is an equitable doctrine which provides the remedies of damages or specific performance for agreements that would otherwise be barred by the statute of frauds. *See Beckendorf v. Beckendorf*, 76 Wn.2d 457, 465, 457 P.2d 603 (1969); *Miller v. McCamish*, 78 Wn.2d 821, 479 P.2d 919 (1971).

■ ■ The first requirement of the doctrine of part performance of oral contracts is that the contract must be proved by clear, cogent, and convincing evidence. *Granquist*

*v. McKean*, 29 Wn.2d 440, 445, 187 P.2d 623 (1947). The second requirement is that:

> the acts relied upon as constituting part performance must unmistakably point to the existence of the claimed agreement. If they point to some other relationship, such as that of landlord and tenant, or may be accounted for on some other hypothesis, they are not sufficient.

*Granquist*, 29 Wn.2d at 445. Where the evidentiary standard is clear, cogent, and convincing, the appellate court must determine whether the substantial evidence in support of the findings of fact is "highly probable." *In re Marriage of Schweitzer*, 132 Wn.2d 318, 329, 937 P.2d 1062 (1997).

■■ George contends that the trial court's findings are not supported by clear, cogent, and convincing evidence, but his argument is based solely on his perception that the trial court erred in finding that DewBerry's testimony regarding the creation of the agreement was more credible. The trial court's credibility findings are not subject to review on appeal. *In re Marriage of Fiorito*, 112 Wn. App. 657, 667, 50 P.3d 298 (2002). Here, the terms of the agreement were clear and simple. Several witnesses testified that the parties created an oral prenuptial agreement and that George and DewBerry acted in accordance with that agreement. Furthermore, despite George's denial of the agreement, the steps taken by the parties to avoid commingling of their assets were unusually strong evidence of a separate property agreement. It was undisputed that the parties meticulously accounted for and handled their individual incomes as separate property and created minimal joint accounts to handle certain family-related expenses and requirements. The husband and wife relationship cannot account for such painstaking efforts to establish and maintain separate property. We conclude that the trial court's determination that an oral agreement was made is supported by substantial evidence that is "highly probable."

■ George also contends that there was no finding of complete performance to take the agreement out of the

statute of frauds. This contention lacks merit, as the trial court expressly stated in its oral opinion that it found complete performance:

> So, then, looking at whether or not under Washington law the oral contract can be enforced, we have to look then at the exceptions that will allow for an enforcement for such a contract. Performance is certainly one of them. I find that there was really complete performance at least up to the present. I won't go back though all of the factors that I listed, but the parties did clearly keep their property separate.

The oral opinion is expressly integrated into the written findings of fact and conclusions of law. Thus, the trial court's decision to enforce the oral prenuptial agreement was based upon a recognized exception to the statute of frauds and is supported by the proper evidentiary standard.

Although Washington has never enforced an oral prenuptial agreement, several other jurisdictions have. *O'Shea v. O'Shea*, 221 So. 2d 223, 226 (Fla. Dist. Ct. App. 1969); *In re Marriage of Lemoine-Hofmann*, 827 P.2d 587 (Colo. Ct. App. 1992); *Hall v. Hall*, 222 Cal. App. 3d 578, 586, 271 Cal. Rptr. 773, 778 (1990). These cases all involved partial or full performance of an oral prenuptial agreement. The case at bar is similar to the ones cited above because each of those cases involved complete performance of an oral prenuptial agreement during the parties' marriages. *Koontz* and *Graves* are distinguishable because there was no performance of the alleged oral agreement.

We also reject George's contention that the oral prenuptial agreement is void because it is against public policy favoring creation of community property. Under Washington law, there is a presumption that all income earned during marriage will be community property. RCW 26.16.030. This presumption may be rebutted by entering into a separate property agreement, but proof of such an agreement is held to a higher evidentiary standard than a community property agreement. *Ryan v. Diafos*, 110 Wn. App. 758, 37 P.3d 304 (2001); *Kolmorgan v. Schaller*, 51 Wn.2d 94, 99, 316 P.2d 111 (1957).

George argues that Washington law prohibits parties from entering into an agreement to repudiate the community property system and that such an agreement is void because it conflicts with public policy favoring creation of community property. This is not an accurate statement of Washington law. Washington courts have long held that a husband and wife may contractually modify the status of their property. *See Hamlin v. Merlino*, 44 Wn.2d 851, 864, 272 P.2d 125 (1954); *State v. Miller*, 32 Wn.2d 149, 158, 201 P.2d 136 (1948). Public policy favors prenuptial agreements because they are "generally regarded as conducive to marital tranquility and the avoidance of disputes about property in the future." *Friedlander v. Friedlander*, 80 Wn.2d 293, 301, 494 P.2d 208 (1972). Prenuptial agreements are contracts subject to the principles of contract law. *In re Marriage of Burke*, 96 Wn. App. 474, 477, 980 P.2d 265 (1999).

■ Washington courts evaluate prenuptial agreements under the *Matson* two-prong test to determine whether the contract is substantively and procedurally fair. *In re Marriage of Matson*, 107 Wn.2d 479, 730 P.2d 668 (1986). "If fair and fairly made, we have held prenuptial agreements between competent parties to be valid and binding." *Matson*, 107 Wn.2d at 482. The first prong of Matson asks whether the agreement made a fair and reasonable provision for the spouse not seeking enforcement. If the answer is yes, the agreement is valid. If the answer is no, the second prong asks whether there was full disclosure of the value and nature of the property involved and whether there was full knowledge and independent advice about each spouse's rights. When an oral prenuptial agreement does not purport to waive a spouse's right to an equitable distribution of marital property, *Matson* does not apply. *Matson*, 107 Wn.2d at 482.

■ Here, the terms of the parties' agreement were clear and straightforward. There was no provision of that agreement, however, that directed the trial court to dispose of the parties' property in any particular manner upon dissolution or purported to waive a spouse's interest to an equitable

distribution of property. Accordingly, it is an agreement that falls outside of *Matson*. Nevertheless, even if we were to evaluate the agreement for fairness, as the trial court did, we agree with the trial court that the prenuptial agreement satisfies the *Matson* test. Under the agreement, each party was able to and did accumulate substantial separate property. *Cf. Matson*, 107 Wn.2d at 486 (agreement voided because it prevented wife from accumulating her own separate property or making any claim against her husband's separate property, to which husband devoted substantial time and energy during marriage); *In re Marriage of Foran*, 67 Wn App. 242, 248, 834 P.2d 1081 (1992). There is nothing unfair about two well-educated working professionals agreeing to preserve the fruits of their labor for their individual benefit. Indeed, as the one requesting the agreement, George apparently assumed that he had greater financial security, since he already owned some real estate and had a good job. Although in hindsight George may have been mistaken, this does not change the court's analysis. Both parties were aware of each other's education, assets, and income potential and had ample time to consider the agreement during their 5-year engagement and 14-year marriage. We conclude that the agreement was both procedurally and substantively fair to both parties.

George's next contention is that the trial court erred by "failing to make a fair and equitable property division," as required by RCW 26.09.080. The record shows, however, that all of the parties' separate and community property was before the court, which did exercise its discretion to make an equitable division of property.[1] Therefore, we do

---

[1] The trial court awarded $300,000 of DewBerry's separate property to George to balance the property distribution, stating:

Then the real question for me is: Does equity require or suggest that more should be distributed because of the disparity of their incomes at this time, and because of the length of the marriage, which is, I guess, of moderate length? I do think that, given the good fortunes and the bad fortunes that have evolved on these parties, that Ms. DewBerry herself recognized that equity may require more. She has offered $300,000. I would say that it is difficult to judge these things, but it would seem to me that her ability to earn the kind of monies that she has made in the last several years has been assisted by Mr. George's

not address George's argument that a trial court is always required to comply with RCW 26.09.080, even if a valid prenuptial agreement provides a different disposition. As we have already concluded, the agreement at issue here did not bind the parties to any division of property upon dissolution. The trial court properly considered the parties' prenuptial agreement and the RCW 26.09.080 factors in making its distribution.

 Moreover, "[t]he trial court has broad discretion in awarding property in a dissolution action, and will be reversed only upon a showing of manifest abuse of discretion." *In re Marriage of Fiorito*, 112 Wn. App. 657, 667-68, 50 P.3d 298 (2002). Just and equitable distribution does not mean that the court must make an equal distribution. *Friedlander*, 80 Wn.2d at 305. In a well-reasoned oral opinion, the trial court fully set forth tenable grounds for dividing the parties' property in accordance with the parties' prenuptial agreement. The court's disposition relied in part on the fact that each party accumulated substantial separate property during the marriage and both parties are capable of working full-time and continuing to accumulate and manage their assets. Based upon the parties' agreement and expectations under that agreement, it cannot be said that the trial court's property distribution was an abuse of discretion.

Lastly, we address George's contention that the trial court erred when it imputed income of $48,000 to him even though he now earns less money in his two part-time jobs for UPS and as a longshoreman. George claims that his part-time jobs constitute full-time employment and that the trial court could not have imputed income if he were

---

parenting. I think it is clear that it is harder as a single parent to both work to your full capacity and also meet your parenting responsibilities, and she recognizes this by her testimony that she may have to cut back her hours to spend more time with the children.

I do feel that further equitable distribution is appropriate and I will adopt the figure of $300,000 that she proposed.

An additional $300,000 cash is an equity distribution from her separate property.

working full-time. He also claims that he cannot earn $48,000 per year without changing jobs or working in excess of 40 hours; thus, the amount of income imputed was an abuse of the court's discretion. Neither claim has merit.

■■ An award of child support is reviewed for an abuse of discretion. *In re Marriage of Curran*, 26 Wn. App. 108, 110, 611 P.2d 1350 (1980). Under RCW 26.19.071(6), the trial court must impute income to a parent who is voluntarily underemployed. The court first determines whether or not a parent is voluntarily underemployed based upon the parent's work history, education, health, age, and other relevant factors. *In re Marriage of Peterson*, 80 Wn. App. 148, 153, 906 P.2d 1009 (1995). "If a parent is underemployed but also 'gainfully employed on a full-time basis,' the court must make a further determination as to whether the parent is 'purposely underemployed to reduce the parent's child support obligation.'" *Peterson*, 80 Wn. App. at 153 (quoting RCW 26.19.071(6)). The court may not impute income to a parent who is gainfully employed full-time unless the court finds that the parent is voluntarily underemployed and is purposefully underemployed to reduce the parent's child support obligation. RCW 26.19-.071(6).

■ The trial court found that George was voluntarily underemployed and imputed income at a level of $48,000 per year for the purposes of child support. The facts pertinent to the court's determination were that George is a healthy, 47-year-old college graduate with a history of executive-type sales and marketing jobs. In late 1999, George lost a job where he earned $55,000 per year. George testified that he started working 20 hours per week at $10 per hour at United Parcel Service in January 2000 because it provided good benefits for part-time work. This job gave him the flexible schedule required for him to work toward the requirements for a new career as a longshoreman. George does not argue that he is unemployable, and all of the evidence indicates that his underemployment has been brought about by his own free choice. *See In re Marriage of*

*Brockopp*, 78 Wn. App. 441, 446 n.5, 898 P.2d 849 (1995). While there was no suggestion that George is trying to lower his income to avoid child support, the trial court's determinations that George is not employed full-time and is voluntarily underemployed are supported by the record.

We also reject George's argument that it was improper to impute his income at a level higher than he could earn from 40 hours of longshore work. In *Peterson*, we held that it was an abuse of discretion to impute income based upon national averages after the trial court found that the full-time work with below average salary was consistent with the parent's work history. *Peterson*, 80 Wn. App. at 154. Basing George's imputed income on the salary levels he maintained during the 1990s was reasonable and appropriate under RCW 26.19.071(6).

George has requested an award of his attorney fees on appeal pursuant to RCW 26.09.140. Based upon the record, it appears that both parties have sufficient financial resources to pay their own attorney fees. Accordingly, we decline his request.

We affirm.

Cox, A.C.J., and Grosse, J., concur.

Reconsideration denied March 5, 2003.

Review denied at 150 Wn.2d 1006 (2003).