IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JENNA KASS, | | No. 86834-9-I |
| Respondent, | | |
| v. | | DIVISION ONE |
| ANDREW KASS, | | |
| Appellant. | | UNPUBLISHED OPINION |

CHUNG, J. — Andrew Kass appeals a trial court's final orders dissolving his marriage to Jenna Kass. He contends the trial court erred by determining there was not an oral prenuptial agreement between the parties that changed the character of community property to separate property and by imposing an equitable lien against his separate property. He also argues the trial court erred when it denied his motion for reconsideration as untimely. We disagree and affirm.

FACTS

Jenna Pierce, formerly known as Kass, and Andrew Kass met in 2012 while they were both employed at Microsoft. The parties each have children from previous marriages, but they have no biological or adopted children together. In March 2014, the parties became engaged to be married. At that time, the parties lived in separate homes. Jenna[1] owned two separate parcels of real property and Andrew lived in a home in Sammamish, which he owned as his separate property.

_____

[1] Because the parties shared a last name at the time of the trial court proceedings, we use their first names for clarity.

As the parties discussed the prospect of marriage, Andrew remained apprehensive in some respects because of a prior bitter divorce experience. He believed that his previous wife had taken advantage of him by trying to acquire his separate property. Despite some discussion about finding a new home for the parties and their children to live in, the parties ultimately decided that Jenna and her son would move into Andrew's Sammamish home. To ease Andrew's lingering unhappiness about his first divorce, Jenna decided she should sell her two parcels of real property to pay off her debt, which she believed would alleviate financial concerns associated with starting a new marriage with Andrew.

It is undisputed that the parties discussed the prospect of a prenuptial agreement and that as the wedding date approached, Jenna remained open to such an agreement. Andrew testified that he discussed the issue at a "high level" and presented Jenna with a "general outline" of the prenuptial agreement that he contemplated. Jenna testified that Andrew remained angry about his experience in the first divorce and brought up that theme during their discussions.

The only writing in evidence concerning the prospect of a prenuptial agreement is an email dated October 16, 2014, entitled "Wedding Stuff." In pertinent part, Jenna wrote to Andrew:

> [W]e have talked about a prenup and really need to nail that down in the next 4-6 weeks to avoid working through this during the holidays or last minute. Can you please work on that and get me a copy so Kurt[2] can review[?] I can get you a list of current assets, but I think I may have sold at least the beach house by Jan. The only other thing I have besides [the] Renton [house] is my retirement fund and a little stock, both totaling around $110k.

---

[2] Kurt was Jenna's attorney.

2

In the trial court's findings, it noted that Andrew did not provide a comparable document setting forth his assets. The trial court found that Jenna "testified credibly" that she was generally aware of Andrew's salary and that he owned the Sammamish home, but she was not privy to the extent of his retirement savings, other stocks, or exactly how much he earned through bonuses and restricted stock units (RSUs). It is also undisputed that Andrew never followed up on Jenna's request to see a draft of the contemplated prenuptial agreement. The parties married on January 24, 2015, without executing a written prenuptial agreement.

Jenna filed a petition for dissolution on January 6, 2023. The trial occurred on May 14-16, 2024, in King County Superior Court.

At trial, during a portion of his cross-examination, Andrew was asked when the parties made an "oral prenuptial agreement." He could not recall an exact date but believed it may have been in July 2014 and that they "probably" discussed it in his home office. Andrew testified that he proposed that going forward, the parties would pool their salaries and cash bonuses for monthly financial operations. But as to his home and retirement assets, Andrew claimed he told Jenna that after they married, he wanted to keep them as his separate property and that she could keep her retirement accounts separate. He also testified that the salary pooling would allow Jenna to maximize her retirement contributions and thereby "build equity" more efficiently. Andrew claimed that Jenna agreed to this arrangement, in part because she purportedly said she "would never go after [his] money."

Jenna "hotly disputed" any such "oral prenuptial agreement" and insisted that she had never heard that term until the dissolution litigation began. To the contrary, she

3

testified that if she had been aware of any prenuptial agreement, she would not have sold her separate real property and would have managed her debt differently. She also testified that she never sought to claim any of Andrew's separate assets, which she understood to be the assets he acquired before the marriage.

Jenna did not dispute that the Sammamish home was Andrew's separate property, but she did assert the community was entitled to an interest in it based on its contributions during the marriage. Specifically, she offered testimony about the type of improvements on the house during the marriage, the cost of that work, and her management of those projects. Based on these contributions from the marital community, Jenna requested an equitable lien against the Sammamish home.

After trial, the court issued its findings and conclusions about the marriage. Regarding the issues on appeal, the court found that there was no oral prenuptial agreement and that the community was entitled to an equitable lien on the Sammamish home due to its contributions toward improvements.

After the court entered its final dissolution orders on May 30, 2024, Andrew moved for reconsideration, arguing the equitable lien should either be removed entirely or reduced to the "actual cost of the money expended without appreciation." The motion was originally set for consideration without oral argument on June 21, 2024, but Andrew subsequently struck this initial hearing and re-noted his motion for July 5, 2024. On July 5, 2024, the trial court denied Andrew's motion as untimely because the motion was not noted within thirty days of entry of the final orders, as required by CR 59(b).

Andrew timely appeals.[3]

---

[3] Before receiving a ruling from the trial court on his motion for reconsideration, Andrew filed an initial notice of appeal from the final orders on June 25, 2024. He then filed another notice of appeal on

DISCUSSION

Andrew argues that the trial court erred when it determined there was no oral prenuptial agreement. He further contends that the trial court erred when it applied an equitable lien to his separate property, arguing that Jenna's expert incorrectly determined, according to Internal Revenue Service (IRS) standards, which projects qualified as "capital expenditures" and thus could be considered as a portion of the overall value of the Sammamish home. He also argues the trial court erred as a matter of law when it denied his motion for reconsideration as untimely.

I. Oral prenuptial agreement

Andrew contends that the trial court erred when it found there was no oral prenuptial agreement establishing that he and Jenna "each would keep all accounts in their own names separate and each would keep their own future retirement savings (401ks, IRAs, etc.) and their own stock awards." He asserts that clear and convincing evidence supported a finding that "all separate property before the marriage remained the separate property of each."

"All property acquired during a marriage is presumed to be community property," and "[t]he law favors characterization of property as community property unless there is no question of its separate character." In re Marriage of Mueller, 140 Wn. App. 498, 504, 167 P.3d 568 (2007). "A spouse may overcome this heavy presumption with clear and convincing evidence of the property's separate character." Id. " '[C]lear, cogent, and convincing' evidence is a quantum of proof that is more than a preponderance of the evidence, but less than what is needed to establish proof beyond a reasonable doubt."

_____

July 11, 2024, after the trial court denied his motion. This court treated this second notice as an amended notice of appeal in Andrew's original appeal.

Mueller v. Wells, 185 Wn.2d 1, 10 n.5, 367 P.3d 580 (2016) (quoting Bland v. Mentor, 63 Wn.2d 150, 154, 385 P.2d 727 (1963)).

One of the ways a spouse may overcome this burden is by proving the existence of either a written or oral agreement that changed the status of their community property to separate property. Mueller, 140 Wn. App. at 504. "A spouse seeking to enforce an agreement, whether oral or written, that purports to convert community property into separate property must establish with clear and convincing evidence both (1) the existence of the agreement and (2) that the parties mutually observed the terms of the agreements throughout their marriage." Id. (citing Kolmorgan v. Schaller, 51 Wn.2d 94, 98, 316 P.2d 111 (1957)). "Because oral agreements are more difficult to prove, courts will overturn an oral property agreement if the parties do not consistently adhere to the agreement during their marriage." Id. at 504-05.

"[W]here the evidentiary standard is clear and convincing, we uphold the trial court's findings of fact if they are supported by 'highly probable' substantial evidence." Id. at 505. "Reviewing a trial court decision under this standard does not permit us to weigh evidence, which is a trial court function." Id. "We merely review the factual findings to determine whether they are properly supported by substantial evidence, and whether they in turn support the legal conclusions." Id.

In DewBerry v. George, this court explicitly addressed the validity of spouses' purported oral agreement regarding the character of property and found clear, cogent, and convincing evidence of an oral separate property agreement. 115 Wn. App. 351, 355, 62 P.3d 525 (2003). Prior to the marriage, the parties agreed to the following conditions: "(1) [one of the spouses] would always be fully employed; (2) each party's

6

income and property would be treated as separate property; [and] (3) each party would own a home to return to if the marriage failed." Id. at 356. Regarding the existence of the agreement, "several witnesses testified that the parties created an oral prenuptial agreement and that [the spouses] acted in accordance with that agreement." Id. at 362. Furthermore, the record reflected "painstaking and meticulous effort to maintain separate finances and property." Id. at 356. Indeed, "during their marriage, [the spouses] deposited their incomes into separate accounts which they used for their personal expenses and investments." Id. Accordingly, because there was evidence of the agreement, as well as evidence of the parties' performance of the agreement, this court held the agreement satisfied the statute of frauds and was legally enforceable. Id. at 363.

In contrast, in Mueller, this court held that there "was no oral agreement changing the presumptive character of the property as community." 140 Wn. App. at 503. One spouse attempted to prove an oral agreement that they would "divide the remainder of [one spouse's] income after the payment of joint expenses." Id. at 502. The parties disputed "the exact circumstances of this discussion" to this effect, including "who did what proportion of the talking, and exactly what was said." Id. The testimony showed that "they each objectively manifested different intents," and the spouse looking to prove the existence of the agreement "offered no evidence that [the other spouse] intended to change the legal ownership of the property . . . [and] did not mention the legal status of the property . . . or explain to [the other spouse] that [they] would be waiving [their] community interest in [the other spouse's] half of the income." Id. at 507. Instead, "[t]heir only objective manifestation of intent was an agreement to divide [] income for

management purposes." Id. Furthermore, after the spouses allegedly entered into the agreement, "the evidence shows that they somewhat consistently managed their money separately throughout the marriage." Id. at 508. While there were instances that reflected each party adhering to such an agreement, the record also reflected times that one spouse would spend from their half of the income for joint expenses, thus benefiting the community. Id. Accordingly, the reviewing court could not conclude an agreement existed or that the parties consistently adhered to said agreement throughout the marriage. Id.

Here, Andrew challenges finding of fact (FoF) 18, in which the trial court found that Andrew did not prove by clear, cogent, and convincing evidence that "there was any oral prenuptial agreement," and FoF 19, in which the court found there was no "evidence that the parties unmistakably acted as if there were an agreement." We conclude that substantial evidence supports these findings, as well as the trial court's related findings.

On appeal, Andrew argues that there was "uncontradicted evidence" that the parties purportedly "agreed that their separate property before marriage would remain their separate property thereafter." However, this iteration of the alleged agreement is not what Andrew presented at trial. Rather, at trial, he claimed they agreed to treat "retirement funds, 401k, stocks" earned during the marriage as the separate property of each spouse.[4] He testified that this "clear, firm agreement" came about around July 2014 at his home and alluded to "reduc[ing] it to paper." However, it is undisputed that no writing related to a prenuptial agreement was ever produced at trial. And while Jenna

---

[4] The trial court found that Andrew first asserted a separate property interest in retirement assets and RSUs earned post-marriage in an interrogatory response.

agreed that "all separate property from before [the] marriage could be separate property ongoing," she denied discussing, much less agreeing, that retirement funds and RSUs earned by each of them during the marriage would be converted from a community asset to a separate asset.

As an initial matter, Andrew challenges the trial court's FoF 16 that as to the existence of an oral prenuptial agreement, Jenna's testimony was "more credible than [Andrew] on [the] issue"[5] because "credibility was not at issue." But aside from Jenna's October 16, 2014, email, the only evidence on the matter was Andrew's and Jenna's testimony. Thus, their credibility was indeed at issue. And "[c]redibility determinations by the finder of fact are not reviewable." In re G.W.-F., 170 Wn. App. 631, 641, 285 P.3d 208 (2012).

In addition to challenging the finding that Jenna was more credible, Andrew also challenges other findings relating to the existence of an oral prenuptial agreement. Though Andrew broadly assigns error to the entirety of FoF 16, he presents no persuasive argument supports his claim that the court's findings were not supported by substantial evidence. FoF 16 states accurately that Andrew testified to presenting a "general outline" to Jenna. He also testified that he "believed that we were both on the same page, that . . . we would get [a prenuptial agreement] and that the high-level principles were set." In addition, the court found in FoF 16 that while Andrew testified that he and Jenna "sat down and made notes about which assets would be 'easy' to

_____

[5] More specifically, FoF 16 states, "[Andrew's] claim of an 'oral' prenuptial agreement is murky, implausible, and unpersuasive. First, the existence of an oral agreement is based only on [Andrew's] self-serving testimony. The Court also finds [Jenna] more credible than [Andrew] on this issue. . . . The Court is also incredulous that [Andrew], who otherwise is and touts himself to be a sophisticated actor, and also was so adamant about not repeating the terrible experience of his first divorce, would not have taken more deliberate and effective steps in documenting any such agreement had one in fact existed."

figure out were joint or separate," no notes were available as evidence. The court also found that Andrew did not discuss these alleged notes when he testified about "the specific agreement that purportedly occurred in July 2014," and Andrew does not identify any evidence to the contrary. Like the spouse in Mueller, 140 Wn. App. at 509, who failed to offer evidence of intent to convert community property into separate property, Andrew failed to present evidence that he and Jenna agreed to change the legal status of their property or that he explained to her that if they did so, she would be waiving her community interest in his half of the retirement benefits and RSUs. We conclude that FoF 16 was supported by substantial evidence.

Andrew also challenges the related FoF 17, which stated:

More telling of no agreement, at least as to critical details, was the October 16, 2014 email where [Jenna] clearly wanted to "work[] through" this issue of a prenuptial agreement and review [Andrew's] terms with her lawyer. See Ex. 343. Even if this July 2014 discussion/agreement really took place, the October 16, 2014 email belies any meeting of the minds about the specific points, much less [Jenna's] assent, because she expressly wanted to review any agreement with her lawyer.

Andrew also challenges a portion of FoF 8 that this October 16 "email was consistent with [Jenna's] testimony that despite [Andrew's] articulated interest in a prenuptial agreement she did not know the specifics of any contemplated agreement." But, as discussed above, the court found Jenna's testimony more credible, and Jenna testified that she asked for further details on the prenuptial agreement months after the July 2014 meeting with a stated desire for her lawyer to review it. Consequently, even if Andrew testified otherwise, substantial evidence supports the finding in FoF 17 that Jenna's October 2014 email "belie[d] any meeting of the minds about specific points" in any prenuptial agreement to the contrary, as well as the court's finding that "even

assuming [Jenna] told [Andrew] that she 'would never go after [his] money,' this pledge does not translate into any agreement to forgo a claim to a significant portion of the parties' community property, which includes [Andrew's] retirement assets and RSUs acquired during the marriage."[6]

We also conclude that based on the findings discussed above, along with the court's other findings relating to the existence of an agreement, the trial court correctly determined in FoFs 19 and 20 that Andrew failed to prove by clear, cogent, and convincing evidence that there was an oral prenuptial agreement to change the character of his retirement assets and RSUs from community to separate property. The court explained in findings 19 and 20,

> [19.] Unlike [in] *DewBerry*, there were no witnesses to an initial agreement or any later events that are consistent with [Andrew's] claim that he could legitimately claim as separate property retirement assets, RSUs, and other compensation he received from Tableau or Elasticsearch during the marriage. Although the parties' retirement accounts largely bear only one name as the account holder, this appears to be due to a default designation by the employers who set up the accounts. And as to the much disputed E-Trade account, this account does have both parties' names as account holders. And the parties regularly received statements showing that designation, see, e.g., Exs. 263 and 328, despite [Andrew's] testimony that he only looked at statements online and mistakenly believed he was the only account holder . . . .
>
> 20. Here, contrary to *Mueller* and *DewBerry*, questions abound about how the parties treated [Andrew's] retirement assets and RSUs received during the marriage. There was no oral agreement to change the character of these assets. The Court finds that they are community assets as set forth in Exhibit 1, the Asset and Debt Spreadsheet.

---

[6] The court also stated, "As a legal matter, RSUs earned during the marriage are no less 'her money' than 'his money' because they belong to the marital community." While it is labelled a finding, the second sentence is a conclusion of law and, as such, subject to de novo review. Union Local 1296, Intern. Ass'n of Firefighters v. City of Kennewick, 86 Wn.2d 156, 162, 542 P.2d 1252 (1975) ("if what is in fact a conclusion of law is wrongly denominated a finding of fact, it is, nevertheless, subject to review."). But Andrew does not provide argument or authority challenging the court's statement that RSUs earned during the marriage are community property.

These findings are supported by substantial evidence. Andrew did not present testimony supporting his claim that retirement assets, RSUs, and other compensation earned during the marriage should be treated as separate property. Rather, Andrew testified that it was his employers who put his 401k funds and RSUs into accounts in his name simply "as an employee." Moreover, Exhibits 263 and 328 and supporting testimony from Jenna also demonstrated that both parties were account holders of the E-Trade account, even though Andrew testified he mistakenly believed he was the only account holder.

The court further stated in FoF 19, "[A]lso unlike *DewBerry* and *G.W.F.*, the parties did not meticulously account for and handle their individual incomes as separate property, and in fact they created major joint accounts where they not only paid day-to-day expenses, but they also deposited some of their stock holdings in a JP Morgan account to allow for joint investments." Substantial evidence supports this finding as well.

The record also shows that the parties did not adhere to a mutually agreed upon arrangement to treat income, retirement accounts, or RSUs as separate property. Andrew and Jenna both acknowledged that at the beginning of the marriage, the two opened a joint account where they deposited all their income and bonuses and paid for "all of [their] expenses"—i.e., it was used for joint needs but was also put toward separate assets. However, Andrew testified that it was his employer, not him, who put his 401k funds and RSUs into accounts in his name as an employee. Furthermore, the one account at issue that the parties themselves established—the E-Trade account holding Andrew's Elasticsearch RSUs—was in both parties' names. Although Andrew

specified this action was accidental, he also acknowledged that both parties regularly received statements for this account that identified both parties as account holders. Finally, Andrew acknowledged that he paid for a portion of another home the parties owned together—the Suncadia house— by cashing out shares from an alleged separate account and depositing them into their joint account. Therefore, substantial evidence supported the trial court's findings that the parties did not consistently adhere to an oral agreement to keep separate property separate throughout the marriage.

Thus, the trial court did not err by finding Andrew failed to present clear, cogent, and convincing evidence of an oral agreement to treat certain property and accounts as separate property and, therefore, failed to overcome the presumption of community property.

## II. Equitable Lien on the Sammamish Home

Andrew next challenges the trial court's award to Jenna of an equitable lien on the Sammamish home. At trial, Jenna presented the testimony of Michael Moss—a certified public accountant (CPA)—who the trial court qualified as an expert. On appeal, despite challenging a series of findings related to the topic, Andrew asserts that the issues he raises "are legal ones, i.e., whether Mr. Moss's determination of what he considered capital expenditures rather than repairs/maintenance was consistent with the IRS standards he relied on to make the determination, whether Mr. Moss improperly calculated passive appreciation into the amount of the equitable lien, and whether the court erred by agreeing and adopting his analysis."

Community property contributions to separate property can give rise to a "community right of reimbursement protected by an equitable lien." In re Marriage of Kile

and Kendall, 186 Wn. App. 864, 884, 347 P.3d 894 (2015). Ordinarily, "the measure of recovery is dollar for dollar, rather than a portion of the increase in value." In re Marriage of Wakefield, 52 Wn. App. 647, 652, 763 P.2d 459 (1988). The presumption is that the increase in value of separate property remains separate property. Elam v. Elam, 97 Wn.2d 811, 816, 650 P.2d 213 (1982). However, "[t]his presumption may be rebutted by direct and positive evidence that the increase is attributable to community funds or labors." Id. "This rule entitles each spouse to the increase in value during the marriage of his or her separately owned property, except to the extent to which the other spouse can show that the increase was attributable to community contributions." Id. at 816-17. In those instances, "the community should be entitled to a share of the increase in value due to inflation in proportion to the value of community contributions to the property." Id. at 817.

We review a trial court's determination that the community contributed funds to one party's separate property for substantial evidence. Kile, 186 Wn. App. at 884. A trial court's decision to impose an equitable lien is reviewed for an abuse of discretion. Miracle v. Miracle, 101 Wn.2d 137, 139, 675 P.2d 1229 (1984).

It is undisputed that the parties recognized the Sammamish home as Andrew's separate property and that the home had increased in value from the time of the marriage to the date of separation. By the time of trial, the Sammamish home had a fair market value of $2.75 million and a mortgage balance of $421,013. Over the course of the marriage, the tax-assessed value of the home increased from $1.208 million in 2015 to $2.691 million in 2022. The parties did not dispute these values. And Jenna did not request reimbursement for the community's payment of the monthly mortgage, property

taxes, and maintenance over the course of the marriage. But Jenna asserted the community was entitled to an equitable lien for its contributions during the marriage.

Andrew assigns error to several findings relating to the value of the community's contributions to the home,[7] including FoF 39, which states,

> In regard to the Sammamish home, the parties agree that in general this real property should be characterized as separate because [Andrew] purchased the home before his second marriage, and during the second marriage he was the only obligor on the mortgage. [Jenna] contends nonetheless that she is entitled to an equitable lien because during the marriage the parties completed, *inter alia*, several capital improvement projects, including a deck replacement, with hot tub addition; major interior painting; carpet replacement; and floor re-finishing. See Exs. 7-19. The total community funds expended on these projects was $131,575. Ex. 4. [Andrew] counters that these projects, done periodically over 8-year marriage, reflect upkeep to maintain the home among wear-and-tear from a family of 4 children and a dog.

FoF 39 largely restates the parties' positions. However, more specifically, Andrew challenges the court's findings that the value of the community funds expended on capital improvement projects was $131,575, which were based on Jenna's testimony and that of her valuation expert, CPA Moss, as well as exhibits entered into evidence. These findings included the following:

> 41. [Jenna] relied on the analysis of Michael Moss whose report and testimony were offered to support a gross amount of $131,575 spent in community assets that underpinned the equitable lien against the value of the Sammamish home (appraised at a gross value of $2,725,000). See Ex. 4. Mr. Moss reviewed several invoices (Exs. 7-19), which featured a description of work, to determine whether the projects were mere

---

[7] Andrew additionally assigns error to FoF 45, which distinguished this case from Miracle v. Miracle, 101 Wn.2d 137, 675 P.2d 1229 (1984). In Miracle, our Supreme Court affirmed a trial court's decision to refuse "to impose an equitable lien in favor of the community in view of the finding that the community had been adequately compensated for its expenditures by its beneficial use of the premises." Id. at 139. At trial, Andrew argued that Miracle precluded the grant of an equitable lien because the community "received a reciprocal benefit flowing from the use of the property." Because he fails to present argument or authority on the issue in his opening brief, the argument is waived. See Smith v. King, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986) ("The basis of this assignment of error is neither stated nor argued, nor is any legal authority bearing on that issue cited. Accordingly, we consider this assignment of error waived.").

repairs/maintenance, or capital improvements. Using decades of experience making similar determinations for tax purposes, where one defines a capital expenditure as a project that restores the condition of the home to the status quo or improves it, Mr. Moss opined credibly that capital expenditures include those projects that remodel or replace whole parts of a home (such as a roof, deck, carpets, floors, etc.), versus repairs that provide mere maintenance or fix discrete parts (such as replacing a carpet tile, fixing a hole in the roof, or mowing the lawn).

42. Based on this analysis, Mr. Moss calculated that the parties spent a total of $131,575, in piecemeal expenditures from 2017 to 2022. For each year he determined a discrete percentage that each capital improvement represented vis-à-vis the overall value, and then aggregated the percentages at 8.53%. Mr. Moss then applied the percentage to the equity in the Sammamish home to calculate the gross community property share ($232,443). [Andrew] offered no competing expert opinion as an alternative to or critique of Mr. Moss's analysis.

43. The Court agrees with and adopts Mr. Moss's analysis.

Here, substantial evidence supported the trial court's findings that the increase in value of the home was not due solely to inflation but was instead attributable to community funds and labor. The record includes Jenna's testimony regarding the work performed on the house during the marriage and her management of those projects, including remodeling the "entire back of the outside of the house" with a hot tub addition, installing a new outdoor lighting plan, redoing the landscaping, updating the flooring, painting the interior and exterior of the house, installing new shades, replacing and updating carpets, and replacing windows. Andrew did not dispute Jenna's testimony concerning her management of these larger projects.

Aside from Jenna's testimony on the various projects and her contributions, Jenna also presented the testimony of CPA Moss. Based on his nearly 40 years of experience and consulting the IRS standards, he determined whether a project, which included a description of work, qualified as a "repair" or "capital expenditure." He defined a capital expenditure as something that could either restore something to its

16

original condition or improve it. The trial court noted Moss "opined credibly" to this definition, and credibility determinations are not subject to review on appeal. See DewBerry, 115 Wn. App. at 362.

Moss analyzed various remodels and upgrades on the home during the marriage and determined that projects valued at $131,575 qualified as "capital expenditures" and, therefore, he considered that amount as expended community funds that supported an equitable lien. Based on the amount of community expenditures, Moss took the value of the remodel costs per year and divided it by the yearly corresponding assessed values of the home. He then aggregated those yearly percentages and found that the community had an 8.53% interest in the home. Accordingly, based on the home's net value of $2,303,987, Moss concluded the community was entitled to an equitable lien of $232,433.

Andrew did not offer a competing expert opinion on the value of the community funds expended on capital improvement projects. On appeal, Andrew primarily argues that Moss's determination of what constituted a repair or capital expenditure is inconsistent with relevant IRS publications and, thus, the court abused its discretion when it applied an equitable lien based on the analysis. However, at trial, Andrew did not present any of the IRS publications he attempts to introduce now. In determining whether substantial evidence supports the trial court's findings, we are limited to the record that was before the trial court. Bolser v. Clark, 110 Wn. App. 895, 903, 43 P.3d 62 (2002) ("A trial court's findings of fact will be upheld as long as they are supported by substantial evidence *in the record*.") (emphasis added).

Given Jenna's and CPA Moss's testimony on the matter and a lack of a competing expert opinion or other record evidence, substantial evidence supports the trial court's findings that the community had spent $131,575 to improve the Sammamish home. Furthermore, substantial evidence supported the trial court's finding that the community's contributions increased the value of the house by $232,443. Jenna testified as to how she managed the projects and Moss credibly testified about how these projects correlated with an increase in the value of the home. And Andrew did not present any evidence of the amount the house value increased due to the community's contributions. In Matter of Marriage of Kaplan, the trial court did not err in accepting an appraisal value when the other party failed to present evidence to support their claim that upgrades or repairs would be necessary. 4 Wn. App. 2d 466, 480, 421 P.3d 1046 (2018). Similarly, here, where Jenna presented evidence as to the community contributions and resulting increase in home value, and Andrew did not, we conclude the trial court acted within its discretion in concluding that the community was entitled to an equitable lien of $232,433 on the Sammamish house.

III.  Motion for Reconsideration

Andrew argues the trial court committed a legal error and thereby abused its discretion when it denied his motion for reconsideration as untimely. He contends that "since the motion for reconsideration was timely served and filed with notice, the renoted hearing date 30 days after the final orders had no effect on the timeliness of the CR 59(b) motion."

CR 59(b), which covers "new trial, reconsideration, and amendment of judgments," states that

[a] motion for . . . reconsideration shall be filed not later than 10 days after the entry of the judgment, order, or other decision. The motion shall be noted at the time it is filed, to be heard or otherwise considered within 30 days after the entry of the judgment, order, or other decision, unless the court directs otherwise.

The court entered its dissolution decree on May 30, 2024. Initially, when Andrew originally filed the motion for reconsideration on June 10, 2024, he timely noted the hearing for June 21, 2024. He later re-noted the motion for July 5, 2024. Subsequently, the trial court denied the motion, stating

[Andrew's] Motion for Reconsideration of Final Orders is DENIED as untimely. [Andrew] asked that the matter be heard on July 5, 2024, *see* Dkt. 75, which is more than 30 days past the May 30, 2024 date of entry of final orders. *See* CR 59(b) ("The motion shall be noted at the time it is filed, to be heard or otherwise considered within 30 days after the entry of the judgment, order, or other decision . . . .").

"Motions for reconsideration are addressed to the sound discretion of the trial court and a reviewing court will not reverse a trial court's ruling absent a showing of manifest abuse of discretion." Wilcox v. Lexington Eye Institute, 130 Wn. App. 234, 241, 122 P.3d 729 (2005). "A trial court abuses discretion when its decision is based on untenable grounds or reasons." Id.

Andrew argues persuasively that he timely noted his motion and that the initial hearing date is controlling. But even so, his motion failed on the merits, and we may properly affirm on that basis. See J-U-B Engineers, Inc. v. Routsen, 69 Wn. App. 148, 150, 848 P.2d 733 (1993) ("[W]e may sustain a trial court result on any correct ground, even though that ground was not considered by the trial court."). In his motion for reconsideration, Andrew reiterated his argument that the trial court erred when it applied an equitable lien to the Sammamish home. As discussed above, there was substantial evidence to support the associated findings. Additionally, Andrew contended that

19

Moss's testimony was inconsistent with IRS publications covering what qualified as a "repair" versus a "capital improvement." Andrew had not previously introduced any of the IRS publications at trial. Ordinarily, "CR 59 does not permit a plaintiff to propose new theories of the case that could have been raised before entry of an adverse decision." <u>Wilcox</u>, 130 Wn. App. at 241. On this basis, Andrew's motion for reconsideration failed to establish any entitlement to relief.

CONCLUSION

We affirm.

_Chung, J._

WE CONCUR:

_Feldman, J._          _Hazelrigg_