[No. 66693-2-I.   Division One.   September 17, 2012.]

*In the Matter of the Parentage of* G.W.-F. ET AL.

MELISSA FINCH, *Appellant*, v. GARY WIEDER, *Respondent*.

632

*Robert J. Cadranell II* and *Dennis J. McGlothin* (of *Olympic Law Group PLLP*), for appellant.

*Catherine Wright Smith* and *Valerie A. Villacin* (of *Smith Goodfriend PS*) and *Jerry R. Kimball*, for respondent.

¶1 Cox, J. — There is a rebuttable presumption that all property acquired by the parties in a committed intimate relationship is community-like.[1] An oral agreement between such parties to keep their incomes and other property separate during their relationship may rebut this presumption, provided the agreement is performed.[2] Such an agreement must be procedurally and substantively fair.[3] And the termination of the committed intimate relationship may be established by one of the parties unequivocally communicating his or her intent to end the relationship.[4]

¶2 In this parentage proceeding, there was substantial evidence supporting the trial court's finding that an oral agreement existed between Dr. Melissa Finch and Dr. Gary Wieder to retain separate ownership of their separate income and investments. The evidence also supported the finding that they agreed to contribute portions of their separate funds to specified joint obligations. Based on this oral agreement and other factors, the trial court's division of property and debt was proper. And the trial court correctly decided that the committed intimate relationship ended when Dr. Wieder expressed his unequivocal intent to end it. Because there was no error, we affirm.

¶3 Dr. Finch and Dr. Wieder are both well-educated parties to a committed intimate relationship that began in 1984. They are both practicing psychologists with PhDs from the University of Oregon in Eugene.

¶4 They began dating in 1979, while both were attending graduate school. They continued dating long-distance from 1981 until 1984. During that time, Dr. Wieder moved to Seattle. Dr. Finch moved to Boston and then back to Eugene.

---

[1] *Connell v. Francisco*, 127 Wn.2d 339, 352, 898 P.2d 831 (1995).

[2] *See Dewberry v. George*, 115 Wn. App. 351, 365, 62 P.3d 525 (2003).

[3] *In re Marriage of Matson*, 107 Wn.2d 479, 482-83, 730 P.2d 668 (1986).

[4] *In re Pennington*, 142 Wn.2d 592, 604, 14 P.3d 764 (2000) (mutual intent to have a committed intimate relationship is one of the *Connell* factors evidencing such a relationship).

¶5 In June 1984, Dr. Finch moved to Seattle and began cohabitating with Dr. Wieder. The trial court found—and there does not appear to be any dispute—that their committed intimate relationship began then.

¶6 The trial court indicated that Drs. Wieder and Finch entered into an oral agreement in 1987. The unchallenged finding of the court was that they decided not to marry but purposefully structured their lives to create an egalitarian relationship. All life tasks were to be shared equally.

¶7 In keeping with this agreement, the trial court found that the two doctors agreed that each would contribute equally to the payment of their joint household expenses and child care expenses. All other income and property would remain each partner's separate property, invested and used as each wished.

¶8 In 1987, the parties bought land on Mercer Island and began plans to build a house. The parties agreed to co-own the house as their family residence. Dr. Wieder contributed more of the purchase and development money than Dr. Finch.

¶9 In 1989, the parties' first child, G.W.-F., was born. Their second child, A.W.-F., was born in 1992. Dr. Finch took four to five months of maternity leave after each birth.

¶10 Over the course of the relationship, the parties maintained separate accounts, separate investments, and separate health insurance. They maintained a joint account and a joint credit card for certain joint expenses. The parties did not contribute equally to their joint account, however. Usually, the contribution appeared to be 60 percent from Dr. Wieder and 40 percent from Dr. Finch.

¶11 They shared investment in a fund created for their children's college educations. They also shared investments in the family residence and two cars.

¶12 In May 2007, Dr. Wieder told Dr. Finch that he wished to end their relationship. They did not inform their children of the breakup until March 2008. The parties

continued to reside together until July 2009, when they began to live apart.

¶13 Dr. Finch commenced this parentage proceeding, seeking equitable division of all assets acquired by either party during their committed intimate relationship. Fifteen months before Dr. Finch filed this action, Dr. Wieder executed an "Acknowledgment of Paternity."[5]

¶14 The case proceeded to trial, and the trial court found that the parties had a committed intimate relationship that began in 1984. The court also determined that they had an oral agreement respecting separate and community-like property that the court determined was performed and enforceable. The court found that the proceeds from the sale of the parties' family residence and their two cars were jointly owned. It ordered Dr. Wieder to pay $45,000 to Dr. Finch from his share of the proceeds of sale. This was to reimburse Dr. Finch for income she would have realized had Dr. Wieder shared tax deductions for the property. The trial court also ordered Dr. Wieder to pay monthly child support of $218.30 to Dr. Finch for A.W.-F.

¶15 Dr. Finch appeals.

## COMMITTED INTIMATE RELATIONSHIP

¶16 The trial court concluded that there was clear and convincing evidence to support the factual findings and legal conclusions that the parties entered into an oral agreement to maintain their separate income as separate property. Dr. Finch argues that this conclusion was error. She also argues that the court's legal conclusion that the agreement was substantially and procedurally fair was error. We disagree.

---

[5] Clerk's Papers at 12.

■■ ¶17 A trial court's findings of fact are reviewed for substantial evidence.[6] Substantial evidence is that which is sufficient to persuade a fair-minded, rational person of the finding's truth.[7] The reviewing court will not substitute its judgment for that of the fact finder "even though it [may] have resolved a factual dispute differently."[8] Thus, this court defers to the trier of fact for resolution of conflicting testimony, evaluation of the evidence's persuasiveness, and assessment of the witnesses' credibility.[9] An appellate court reviews a trial court's conclusions of law de novo to determine if they are supported by the findings of fact.[10]

### Existence and Performance of Oral Agreement

■■ ■ ¶18 A committed intimate relationship is not a marriage. Thus, "the laws involving the distribution of marital property do not directly apply to the division of property following a [committed intimate relationship]."[11] But, Washington courts may look to those laws for guidance.[12] Therefore, courts may apply by analogy community property laws to committed intimate relationships.[13] The factual findings supporting the court's characterization require "highly probable" substantial evidence to support them.[14] Generally, a trial court's characterization of marital

---

[6] *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).

[7] *Id.*

[8] *Id.* at 879-80.

[9] *Thompson v. Hanson*, 142 Wn. App. 53, 60, 174 P.3d 120 (2007).

[10] *In re Marriage of Zier*, 136 Wn. App. 40, 45, 147 P.3d 624 (2006).

[11] *Connell*, 127 Wn.2d at 349.

[12] *Id.*

[13] *Olver v. Fowler*, 131 Wn. App. 135, 140, 126 P.3d 69 (2006).

[14] *In re Marriage of Mueller*, 140 Wn. App. 498, 505, 167 P.3d 568 (2007).

property as community or separate is a question of law that a court reviews de novo.[15]

■ ¶19 As this court stated in *Dewberry v. George*, "There is nothing in Washington law that prohibits parties from entering into prenuptial agreements that alter the status of community property."[16] Postnuptial agreements have also been recognized by our courts.[17] Partners in a committed intimate relationship, like spouses, may change the status of their community-like property to separate property by entering into mutual agreements.[18]

> These agreements may be oral or written. A spouse seeking to enforce an agreement, whether oral or written, that purports to convert community property into separate property must establish with clear and convincing evidence both (1) the existence of the agreement and (2) that the parties mutually observed the terms of the agreement throughout [the committed intimate relationship]. Because oral agreements are more difficult to prove, courts will overturn an oral property agreement if the parties do not consistently adhere to the agreement during their [relationship].[19]

Thus, to enforce an oral agreement changing the nature of the property accumulated during the committed intimate relationship, a court must find that an oral agreement existed and that it was observed throughout the relationship.

¶20 Two cases from this court have explicitly addressed the validity of an oral agreement in the analogous context of

---

[15] *Id.* at 503-04.

[16] 115 Wn. App. 351, 359, 62 P.3d 525 (2003).

[17] *Friedlander v. Friedlander*, 80 Wn.2d 293, 299, 494 P.2d 208 (1972).

[18] *Dewberry*, 115 Wn. App. at 364 (citing *Hamlin v. Merlino*, 44 Wn.2d 851, 864, 272 P.2d 125 (1954); *State v. Miller*, 32 Wn.2d 149, 158, 201 P.2d 136 (1948)); *Olver*, 131 Wn. App. at 140.

[19] *Mueller*, 140 Wn. App. at 504-05 (footnotes omitted).

marriage: *Dewberry* and *In re Marriage of Mueller*.[20] In *Dewberry*, this court held that prior to their marriage the parties made an oral agreement.[21] Further, the acts of each spouse during the marriage constituted partial performance for purposes of the statute of frauds and unmistakably pointed to the existence of the agreement.[22] Prior to their marriage, the parties orally agreed that "(1) Dewberry would always be fully employed; (2) each party's income and property would be treated as separate property; [and] (3) each party would own a home to return to if the marriage failed . . . ."[23] During their marriage, both parties in the marriage "continually affirmed this agreement through words and actions. The record reflects painstaking and meticulous effort to maintain separate finances and property."[24] Thus, because there was evidence of the agreement and of the parties' performance of that agreement, this court held that it satisfied the statute of frauds and was legally enforceable.[25]

¶21 In contrast, in *Mueller*, this court held that there "was no oral agreement changing the presumptive character of the property as community."[26] There, the parties disputed the exact circumstances of the oral agreement.[27] After the alleged agreement was created, "the parties abided by the alleged oral agreement to varying degrees of consistency."[28] Central to the court's holding was its conclusion that no oral agreement existed that changed the

---

[20] 140 Wn. App. 498, 167 P.3d 568 (2007).

[21] *Dewberry*, 115 Wn. App. at 362.

[22] *Id.* at 358-59, 361-62 (quoting *Granquist v. McKean*, 29 Wn.2d 440, 445, 187 P.2d 623 (1947)).

[23] *Id.* at 356.

[24] *Id.*

[25] *Id.* at 363.

[26] *Mueller*, 140 Wn. App. at 503.

[27] *Id.* at 502.

[28] *Id.*

*nature* of the parties' property.[29] Trial testimony showed that each party "objectively manifested different intents," and thus that there was no meeting of the minds as to how the agreement would work.[30] "Their only objective manifestation of intent was an agreement to divide his income for *management* purposes."[31]

¶22 Here, the trial court decided, based on highly credible evidence from the testimony of Dr. Wieder, "that the parties did in fact enter into an oral agreement to maintain their separate income as separate property. . . ."[32] In connection with that decision, Dr. Finch challenges the following pertinent findings of fact:

2.11.12 Both parties testified to the existence of an agreement whereby each would contribute equally to the payment of their joint household and childcare expenses. They set up a joint checking account and a joint credit card for this purpose. Concurrently, they agreed that the income of each would remain separate property.

2.11.13 As evidence of the existence of this oral agreement, over the course of the next 25 years, the parties avoided comingling their individual and joint assets. Other than their contributions to the joint household account and to other special purpose joint accounts that were created from time to time, notably a college funds [sic] for their children, they kept their individual assets and finances separate. They incurred debt jointly only for the house mortgage, a credit card to be used solely [for] child and household expenses, and after the relationship terminated, two credit cards to finance substantial health care expenses of their oldest child, [G.W.-F.].[33]

---

[29] *Id.* at 507.

[30] *Id.*

[31] *Id.* (emphasis added).

[32] Clerk's Papers at 500.

[33] *Id.* at 439.

Substantial evidence in the record supports these findings as to the existence and observance of this agreement over time.

¶23 Dr. Wieder testified that when he and Dr. Finch first established their committed intimate relationship:

[W]e had an agreement that we were going to split 50/50 everything. We were going to take care of the children half time each, we were going to pay for household expenses half time—50 percent each—we were going to take care of the house 50 percent each, and we were going to earn the same amount of income and contribute to expenses 50/50. Our model was that we would be an egalitarian modern couple with no gender role stereotyping. And over time Dr. Finch breached that agreement and was not earning, as we expected her to do after the birth of the children, was not earning an equivalent income as was I, and so that became an issue between us.[34]

¶24 Dr. Wieder also testified that "the agreement and understanding was that we both owned—we each owned our own retirement, we each owned our own earnings and investments."[35] And he testified that "[w]e had our separate accounts, our separate investments; we had our separate cars; we had our separate health insurance; we paid separate medical expenses; we paid our individual personal expenses; and we created specific accounts to handle joint activities, joint expenses, and child expenses."[36]

¶25 This testimony, which the court stated was "highly credible," supported its finding that there was an oral agreement regarding the nature of each partner's separate property. Credibility determinations by the finder of fact are not reviewable.[37]

¶26 Dr. Finch's testimony also supported the court's finding that the parties maintained separate accounts. Dr.

---

[34] Report of Proceedings (Dec. 21, 2010) at 659.

[35] *Id.* at 711.

[36] Report of Proceedings (Dec. 16, 2010) at 612-13.

[37] *Dewberry*, 115 Wn. App. at 362.

Finch testified that she had a separate banking account, a separate individual retirement account, and a separate credit card account. She did not deny that an oral agreement existed with Dr. Wieder. And it was for the trial court to determine which witness's testimony it found most credible on this point.[38] We conclude that the court properly decided that an oral agreement existed and was mutually observed by both doctors regarding the nature of each partner's separate property.

¶27 Dr. Finch also argues that the parties did not mutually observe the oral agreement throughout the committed intimate relationship. We disagree.

¶28 Both Drs. Finch and Wieder testified to the continued existence of separate accounts and joint accounts, facts which support the court's findings and conclusion that the oral agreement was maintained throughout the committed intimate relationship.

¶29 At the outset, Dr. Finch argues that "[t]he trial court made no finding that the parties mutually observed the alleged oral contract throughout their relationship," and, consequently, that it erred in enforcing the alleged oral contract.[39] She is wrong in this respect.

¶30 The court, in its finding of fact 2.11.13, stated that "[a]s evidence of the existence of this oral agreement, *over the course of the next 25 years, the parties avoided comingling their individual and joint assets*."[40] Further, as Dr. Wieder notes in his brief, the court's unchallenged finding of fact 2.11.6 stated:

> The parties . . . did not pool their income other than the portion they devoted to the shared household expenses. Each party kept her or his income separate and used her or his income as she or he saw fit without control or input of the other. Other

---

[38] *Thompson*, 142 Wn. App. at 60.

[39] Opening Brief at 18.

[40] Clerk's Papers at 496 (emphasis added).

than sharing the costs of the joint household, their finances were kept separate.[41]

Thus, the court did make findings of fact that the agreement was mutually observed.

¶31 Dr. Finch contends that Dr. Wieder's testimony supports her argument that the oral agreement was not performed. She points specifically to his testimony that she breached the oral agreement when she failed to contribute her full share to the joint account.

¶32 We are unpersuaded by this argument. Dr. Finch relies on her alleged breach of an oral agreement as evidence that no agreement existed. The point of Dr. Wieder's testimony appears to be that Dr. Finch failed to fully live up to the terms of their oral agreement. In any event, we view the testimony as proof of a modification of the original terms of their oral agreement to match the changing earning capacities of each partner. As such, this modification does not negate the actual performance of the agreement over time.

¶33 In *Dewberry*, this court addressed the appellant's argument that insufficient performance of the oral agreement in that case negated it.[42] We rejected the contention, comparing that case with others that involved partial or full performance of an oral prenuptial agreement.[43] In distinguishing other authorities, we stated that they involved no performance of the alleged oral agreements.[44]

¶34 Here, following the *Dewberry* reasoning, it would make no sense to void an oral agreement between Drs. Finch and Wieder where the terms were modified over the time of its performance to meet the changing needs of these parties. As the trial court determined, the parties observed

[41] *Id.* at 495.

[42] *Dewberry*, 115 Wn. App. at 362-63.

[43] *Id.* at 360-62.

[44] *Id.* at 360-61.

their oral agreement, as modified to fit their changed circumstances, over the life of their relationship. That is sufficient under the circumstances of this case to support the court's decision.

¶35 Dr. Finch also contends that Dr. Wieder did not observe the terms of their oral agreement because he took all major tax deductions for their family home. He did. But this alone is insufficient to negate the existence and observance over time of the parties' oral agreement.

¶36 In any event, the court recognized that Dr. Finch was entitled to reimbursement for the income she would have had if Dr. Wieder had shared the tax deductions. The court required that she be reimbursed $45,000 from Dr. Wieder's share of the proceeds of sale of the family residence. This was a proper exercise of the court's discretion.

¶37 Finally, Dr. Finch claims that the unequal contributions the parties made to purchase the vacant land on which they built their family residence demonstrate lack of performance of the agreement. We disagree.

¶38 This limited exception to the parties' otherwise careful separation of their income and other property does nothing to undermine the court's conclusion that the parties observed their oral agreement throughout their relationship. We also note that this property was determined by the court to be jointly owned by both when the court considered the division of property.

## Fairness of Agreement

¶39 Dr. Finch next argues that the oral agreement to which Dr. Wieder testified was both substantively and procedurally unfair. We disagree.

¶40 *In re Marriage of Matson*[45] sets forth a two-pronged test concerning the fairness and enforceability of a pre- or

---

[45] 107 Wn.2d 479, 730 P.2d 668 (1986).

postnuptial agreement.[46] That test is applicable here and is satisfied.

¶41 Under the first prong, the court determines whether the agreement is substantively fair,[47] that is, whether it provides a fair and reasonable provision for the party not seeking the agreement's enforcement.[48]

¶42 The second prong requires the court to examine the procedural fairness of the contract by asking two questions:

> (1) whether full disclosure has been made by [the parties] of the amount, character and value of the property involved, and (2) whether the agreement was entered into fully and voluntarily on independent advice and with full knowledge by [both spouses of their] rights . . . .[49]

If a party can demonstrate that the agreement is substantively fair, the court need not examine its procedural fairness.[50]

¶43 Here, the trial court applied the *Matson* test and concluded that

> [t]he parties' agreement freely allowed Dr. Finch to use her separate income to accumulate her own separate property. There is nothing unfair about two well-educated working professionals agreeing to preserve the fruits of their labor for their individual benefit. The agreement was substantively and procedurally fair to both parties.[51]

The trial court's conclusion of law is supported by findings of fact, noted above, which are supported by substantial evidence in the record. Dr. Finch established her own

---

[46] *Id.* at 482-83.

[47] *Id.* at 482.

[48] *Id.*

[49] *Id.* at 483 (alterations in original) (quoting *Whitney v. Seattle-First Nat'l Bank*, 90 Wn.2d 105, 110, 579 P.2d 937 (1978)).

[50] *Dewberry*, 115 Wn. App. at 364.

[51] Clerk's Papers at 500.

savings account and her own investments, as did Dr. Wieder.

¶44 Further, as the trial court correctly determined, the loan application connected with the purchase of land for the family residence supported the procedural fairness of the oral agreement:

> The loan application was made jointly and the debt was incurred in both names. *The loan application by the parties reflects their understanding and acknowledgement of their equal earning capacity and education.* . . . They agreed that the monthly payments on the debt, the taxes and insurance for the jointly owned home would be paid from the joint account they established for their common household expenses and their children's expenses.[52]

Though challenged, this finding of fact is supported by the loan application and other evidence in the record. In the application, both Drs. Wieder and Finch fully disclosed their separate and joint assets.

¶45 In addition, the parties also had ample time over the course of their 25-year relationship to consider the oral agreement, as modified due to the changed circumstances of the parties. Nowhere is there any evidence in this record to support the view that either the original oral agreement or any of the modifications to it were unfair.

¶46 As in *Dewberry*:

> the terms of the parties' agreement were clear and straightforward. . . . Under the agreement, each party was able to and did accumulate substantial separate property. There is nothing unfair about two well-educated working professionals agreeing to preserve the fruits of their labor for their individual benefit.[53]

The oral agreement between these parties was substantively and procedurally fair.

---

[52] *Id.* at 495 (emphasis added).

[53] *Dewberry*, 115 Wn. App. at 364-65 (citations omitted).

¶47 Dr. Finch relies on *In re Marriage of Bernard*[54] to support her argument that the agreement was unfair, but that case is distinguishable. In *Bernard*, there was a significant disparity in the premarriage wealth of the parties.[55] Additionally, Gloria Bernard signed the agreement a day before the planned wedding.[56] The supreme court noted that "an agreement disproportionate to the respective means of each spouse, which also limits the accumulation of one spouse's separate property while precluding any claim to the other spouse's separate property, is substantively unfair."[57]

¶48 Here, unlike *Bernard*, the oral agreement was not disproportionate to one partner, as both had the same education and the same earning potential. There is no evidence that the agreement was made without the opportunity for reflection by either party. Further, the oral agreement was an agreement that evolved to fit both parties' needs. Though Dr. Finch did take approximately one year off, cumulatively, for maternity leave, Dr. Wieder testified that the parties adjusted their oral agreement to reflect Dr. Finch's lower earning capacity during this period. The oral agreement was procedurally and substantively fair.

## *Termination of Relationship*

¶49 Dr. Finch argues that RCW 26.16.140 should apply to committed intimate relationships and that under this statute the relationship did not end until both parties mutually intended to terminate the relationship. We disagree.

¶50 Under former RCW 26.16.140 "[w]hen a husband and wife are living separate and apart, their respective

---

[54] 165 Wn.2d 895, 204 P.3d 907 (2008).

[55] *Id.* at 898.

[56] *Id.* at 900.

[57] *Id.* at 905.

earnings and accumulations shall be the separate property of each."[58] In a marital relationship, the supreme court has interpreted this statute to mean a marriage is defunct under RCW 26.16.140 only when the facts involve situations where **both** parties demonstrated the marriage was over.[59] In general, then, a marriage is defunct only when there is "**some** conduct on the part of **both** spouses before we will apply the separate and apart statute and characterize property acquired by one spouse as his or her separate property."[60]

¶51 Whether mutual intent to end a committed intimate relationship is required is a question of first impression. As we have already explained, a committed intimate relationship "is not the same as a marriage and the laws involving the distribution of marital property do not apply directly."[61]

¶52 One of the *Connell* factors that our courts use in determining whether a committed intimate relationship exists is the "intent of the parties."[62] More specifically, there must be "mutual intent to form" a committed intimate relationship.[63] The necessary corollary to this requirement to form such a relationship is that it also requires mutual intent to maintain one. Thus, when a party to a committed intimate relationship expresses the unequivocal intent to end the relationship, that relationship ends.

¶53 Here, the court made the following determination:

> In May, 2007, Gary Wieder unequivocally ended the commitment to the marital-like relationship. He conveyed his decision

---

[58] Former RCW 26.16.140 (1972). The trial court found that the committed intimate relationship ended in May 2007. The current version of RCW 26.16.140 went into effect on June 12, 2008.

[59] *Seizer v. Sessions*, 132 Wn.2d 642, 657, 940 P.2d 261 (1997).

[60] *Id.* at 658 (some emphasis added).

[61] *In re Meretricious Relationship of Sutton*, 85 Wn. App. 487, 492, 933 P.2d 1069 (1997) (citing *Connell*, 127 Wn.2d at 348-49).

[62] *Connell v. Francisco*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995).

[63] *Pennington*, 142 Wn.2d at 604.

to Dr. Finch in unequivocal terms. Although the parties continued to share the residence until it could be sold in July, 2009, after May, 2007, there was no longer a stable committed marital-like relationship. Once one party to a committed intimate relationship unequivocally communicates his/her intention to end the relationship, the committed intimate relationship ends.[64]

¶54 The record supports this determination. Dr. Finch testified that when Dr. Wieder told her he wanted to end the relationship, it was "clear to me that Gary was stating that he didn't want to do it anymore in 2007."[65] Dr. Wieder testified that he was unequivocal when he told Dr. Finch that "the relationship was over for me and I was ending it."[66] He stated that "I was quite adamant that it was over and that I wanted to start talking about making some plans to take the next steps to dissolve our relationship."[67] Thus, one party to the committed intimate relationship clearly demonstrated an intent to end it. This intent was communicated to and understood by the other party to the relationship. The relationship ended at this point. The fact that the parties continued to live together for an additional period of time does not require application of the provisions of RCW 26.16.140 to this relationship.

¶55 The balance of this opinion has no precedential value. Accordingly, pursuant to RCW 2.06.040, it shall not be published.

GROSSE and DWYER, JJ., concur.

---

[64] Clerk's Papers at 443.

[65] Report of Proceedings (Dec. 15, 2010) at 376.

[66] Report of Proceedings (Dec. 16, 2010) at 618.

[67] *Id.*