IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of<br><br>NATALYA YEGOROVA,<br><br>                Appellant,<br><br>       v.<br><br>GEORGIY DUBININ,<br><br>                Respondent. | No. 82400-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Natalya Yegorova appeals the trial court's dissolution order related to the validity of two Real Property Agreements (RPAs) and a quit claim deed signed by her then husband Georgiy Dubinin that, if enforced, would entitle her to three-quarters equity in the family house, plus $50,000, and full title to the couple's condo. We hold that the RPAs did not provide a fair and reasonable provision to Dubinin and that he signed the RPAs and quit claim deed under circumstances which were not procedurally fair. The trial court did not err in refusing to enforce those agreements. We also agree with the trial court that Yegorova did not overcome the presumption that the money used to purchase and remodel the properties was community property. Accordingly, we affirm and award Dubinin attorney fees.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

Georgiy Dubinin and Natalya Yegorova started dating and living together in 2010. Yegorova started her beauty salon business in 2006 by renting a chair from another company, but later opened her own business, Indigo Beauty Salon, in 2011. The couple married on August 19, 2012. This was Yegorova's third marriage and Dubinin's first marriage.

Yegorova regularly brought home cash from her salon. Dubinin worked as a user-experience designer. He testified that he would deposit his entire paycheck into their joint account, but Yegorova would only deposit some of her earnings into the account and accumulate savings with the rest. The couple lived off the money in the joint account but used the savings when needed to make a purchase. According to Dubinin, because Yegorova was a workaholic, the funds from her work would accumulate fairly quickly. Yegorova admittedly did not report all her cash earnings on the couple's federal income tax reports.

Shortly after their marriage, the couple purchased a house in Bellevue. The down payment and escrow due totaled $18,987.98. No one disputes that Dubinin's parents contributed $2,000 as a gift. Yegorova and Dubinin dispute the source of the remaining balance. Yegorova claims that she paid the balance with

2

her premarital earnings and possibly cash gifted to her from her mother.[1]

Dubinin testified that the rest of the balance came from a combination of his and Yegorova's savings. Dubinin submitted evidence that Yegorova provided him with three checks totaling $10,000 and testified that Yegorova did not provide any additional cash.[2] Dubinin testified that the rest of the money came from a wire payment from his bank account, which itself contained $14,556 prior to the additional deposits of money.

Though the title and mortgage to the Bellevue house was secured in Dubinin's name, he transferred ownership of the home to the marital community. Soon after the couple closed on the house, Yegorova asked Dubinin to sign the first Real Property Agreement (RPA1). Unbeknownst to Dubinin, months prior to the purchase of the home, Yegorova consulted with a real estate attorney to draft RPA1.[3] The agreement stated in part:

---

[1] Yegorova gave inconsistent testimony as to whether the source of the cash that she said she used to pay toward the down payment and closing of the house came from her own premarital savings or from a cash gift from her mother. She explained in her admitted deposition, "It's not important to divide what come from me, what come from my mother. Because my mom, she give me a gift of money. So kind of I assume it's my money. So it's hard for me to divide which one come from my mother, because back then, it was all in one."

[2] The parties dispute whether Yegorova made an additional $4,000 cash contribution.

[3] Yegorova testified that she consulted with the real estate attorney when the couple decided to purchase a property, sometime in "April or May or June," before the August 2012 purchase.

WHEREAS, in consideration of the purchase of the subject property, and an anticipated contribution by [Yegorova] of approximately $25,000.00 toward the down payment and; WHEREAS, in consideration of the purchase of the subject property, and an anticipated contribution by [Dubinin] of the balance of the down payment, together with closing costs and;

WHEREAS, [Yegorova] has agreed to contribute an additional sum in the approximate amount of $25,000.00 toward jointly agreed household improvements after closing;

IT IS AGREED AS FOLLOWS:

Upon closing of the subject property, [Dubinin] shall promptly quit claim one-half of his interest in the same to [Yegorova].

It is further agreed that upon legal separation or divorce of the parties, [Yegorova] shall be entitled to receive a payment of one half of the parties' then current equity in the real property as described hereinabove, along with her initial $50,000.00 contributions as referred to above.

Dubinin was "caught off guard" by RPA1. He told Yegorova he did not understand where the "random numbers" in the agreement came from, but she refused to answer his questions and pressed him to immediately sign the document, which he did an "hour[] [m]aybe two" hours later in front of a notary. During their marriage, the house underwent multiple remodeling projects.

In June 2014, the couple purchased a second property, a Bellevue condo. The purpose for the purchase was disputed at trial. Dubinin testified that the condo was purchased primarily as an investment property and also as a

4

temporary place for Yegorova's mother, then living in Ukraine,[4] to stay for part of the year. Yegorova testified that the condo was purchased exclusively for her mother who would come to stay in Washington State after the couple had children.

The condo was purchased in both Dubinin and Yegorova's names. The source of the funds for the purchase of the condo also was disputed at trial. Dubinin testified that the money for the condo down payment came from joint funds. As some of the couple's money for the condo was in the form of cash, Dubinin asked his parents to transfer the funds for the down payment masked as a "gift" and the couple would repay them with cash.[5] Yegorova testified that the down payment for the condo came from $30,000 cash given to her by her mother. Yegorova said she and Dubinin asked his parents to write the check for the down payment, then Yegorova gave cash to Dubinin to pay back his parents.

Two months after the couple closed on the condo, Yegorova presented another Real Property Agreement (RPA2) relating to the condo for Dubinin to sign. The agreement stated in part:

> WHEREAS, in consideration of the purchase of the subject property, and an anticipated contribution by [Yegorova] of approximately $50,000.00 toward the down payment and existing

---

[4] Yegorova and her mother are from Sevastopol in Crimea. Due to the contested political situation in Crimea during these years, the record refers to this area as both Russia and Ukraine. We refer to this country as Ukraine for consistency.

[5] At trial, it was explained that certain lending requirements prevented a purchaser from using cash for a property's down payment.

and future remodeling costs:

IT IS AGREED AS FOLLOWS:

1.  Upon the legal separation or divorce of the parties, [Yegorova] shall receive and own all of the parties' interests in the property described above, and [Dubinin] shall immediately quit claim any and all of his interest in said property to [Yegorova].

Unbeknownst to Dubinin, Yegorova hired the same attorney who prepared RPA1 to prepare RPA2.

Dubinin testified that upon asking him to sign RPA2 Yegorova "flipped her narrative" from the condo being a "joint venture" and investment property to claiming the condo was intended for her mother.  Dubinin testified that he merely "scanned" the document as Yegorova refused to answer his questions and continued to "increas[e] the pressure" for him to sign it by following him around and verbally harassing him.  Similar to when he signed RPA1, Dubinin had no independent recollection of signing in front of a notary but remembered that he signed it within an hour or two later after Yegorova first presented it.

In the summer of 2015 the couple remodeled the condo.  The same summer, Yegorova's mother, obtained her lawful permanent residency and moved into the condo.  In October 2015, the couple had their only child.

In November 2018, Dubinin started receiving counseling from a psychotherapist to address difficulties in his relationship with Yegorova. Yegorova knew Dubinin was seeing a psychotherapist because it was one of her

clients who recommended the specific psychotherapist to Yegorova for Dubinin.

The psychotherapist testified at trial that Dubinin suffered from adjustment disorder with mixed emotional features, meaning he had some depression and some anxiety. The psychotherapist said Dubinin lived in fear of his wife's criticism and that he was scared of her reactions. According to the psychotherapist, Dubinin's response to avoid arguing with his wife was not simply a preference to avoid an argument. The psychotherapist testified, "I don't think emotionally he was able to handle it very well. I think it had a very strong effect on him emotionally where maybe another person it wouldn't affect them so deeply."

In February 2019, Yegorova presented Dubinin with a third real property agreement, a quit claim deed for the condo. The agreement stated in part: "Georgiy Dubinin for and in consideration of [l]ove and affection in hand paid, conveys and quit claims to Natalya Yegorova [the Bellevue condo] together with all after acquired title of the grantor(s) herein[.]" Dubinin testified that Yegorova told him she wanted him to sign a quit claim deed and that she made an appointment at a notary within walking distance of his office. Dubinin testified that he did not review the quit claim deed before arriving at the notary, at which point he simply "scanned" the document. Dubinin testified that he was in a "fog" at the time he signed it and wanted to avoid an argument and try to keep the

peace. Dubinin considered the quit claim deed related to RPA2. Yegorova testified that she gave Dubinin the document the day before they went to the notary and he had several hours to review it before signing.

Yegorova admitted that she never suggested to Dubinin to seek the advice of an attorney before asking him to sign any of the agreements. She also testified that Dubinin was upset each time she presented the RPAs but that he was only concerned Yegorova was thinking about a divorce.

In spring 2019, Dubinin found a bag with $66,800 in cash in the couple's closet. Yegorova told him it was her cash she was storing to "buy [him] out" of the house upon their divorce.[6] Dubinin told Yegorova he was going to seek a divorce. Dubinin petitioned for divorce in May 2019 and moved out of the family home in August 2019.

The court held dissolution proceedings in November 2020. Dubinin alleged, and the trial court found, that Dubinin and Yegorova began a committed intimate relationship in 2010. Yegorova did not dispute this at trial. There were two factual disputes at trial relevant to this appeal. First, Yegorova claimed that the cash used for purchasing and renovating the house and condo was her separate property as it originated from cash from her mother. Second, Dubinin argued that the two RPAs and quit claim deed were invalid because he signed

---

[6] Dubinin took approximately half of the cash and eventually turned it in to Yegorova's attorney.

them under undue influence.

The trial court awarded Yegorova her business as separate property but concluded that the house and condo were community property. The court rejected Yegorova's claims that her mother gifted her with large sums of cash for the house and condo. The trial court found:

> The Court rejects the Respondent's argument that the funds invested in the house and the condo, as well as the cash found in the house, belonged to the grandmother (Respondent's mother). The Respondent and the grandmother's story about how the grandmother sold her house in Russia, brought the money over personally to the United States, and gave the money to Respondent lacks credibility.
>
> . . . .
>
> The Court agrees with the Petitioner that the 2 real estate agreements that he signed, for the house and for the condo, should be invalidated. The Court finds Petitioner's testimony to be credible and Respondent's testimony lacking in credibility. The Court finds that Petitioner signed the agreements under undue influence/duress. Additionally, the Court finds the agreements lacked consideration and that the Respondent did not prove that her separate funds were used to purchase the properties or for any of the remodels.

The court awarded the condo to Dubinin and the house to Yegorova if within six months she removed Dubinin's name from the mortgage and paid him his assigned share of equity.[7]

Yegorova appeals the trial court's division of assets and liabilities

---

[7] The court assigned 61.7 percent of the equity in the house to Yegorova and 38.3 percent of the equity to Dubinin.

specifically related to the house and condo.

DISCUSSION

On appeal, Yegorova assigns error to the trial court failing to enforce the RPAs and quit claim deed, and also for failing to reimburse her for separate property contributions to the purchase and improvements of the house and condo. She does not challenge the court's finding that she and Dubinin were in a committed intimate relationship starting in 2010, two years prior to their marriage.[8]

Yegorova's Alleged Separate Property

Yegorova claims that the trial court erred by not giving her credit for her separate property contributions.

Washington courts presume property acquired during marriage is community property. In re Marriage of Kile & Kendall, 186 Wn. App. 864, 876, 347 P.3d 894 (2015). Property acquired prior to marriage may also be considered community property where a court determines that the parties were involved in a "committed intimate relationship." Muridan v. Redl, 3 Wn. App. 2d 44, 53, 413 P.3d 1072 (2018) (citing Connell v. Francisco, 127 Wn.2d 339, 351,

---

[8] Courts consider five, nonexclusive factors when determining the existence of a committed intimate relationship: "(1) continuity of cohabitation, (2) duration of the relationship, (3) purpose of the relationship, (4) pooling of resources and services for joint projects, and (5) the intent of the parties." Muridan v. Redl, 3 Wn. App. 2d 44, 55, 413 P.3d 1072 (2018) (quoting Connell v. Francisco, 127 Wn.2d 339, 346, 898 P.2d 831 (1995) (internal quotation marks omitted)).

898 P.2d 831 (1995)).

To overcome the presumption of community property, a party must offer clear and convincing evidence that a property was obtained with separate funds, and those funds can be traced "with some degree of particularity." Schwarz v. Schwarz, 192 Wn. App. 180, 189, 368 P.3d 173 (2016) (quoting Berol v. Berol, 37 Wn.2d 380, 382, 223 P.2d 1055 (1950)). Separate property is statutorily defined as property acquired before marriage or acquired afterward by a gift or inheritance. RCW 26.16.010. "Separate property will remain separate property through changes and transitions, if the separate property remains traceable and identifiable; however, if the property becomes so commingled that it is impossible to distinguish or apportion it, then the entire amount becomes community property." In re Marriage of Chumbley, 150 Wn.2d 1, 5-6, 74 P.3d 129 (2003).

We review a trial court's factual findings supporting a characterization of property as separate or community for substantial evidence. Kendall, 186 Wn. App. 864 at 876. But we review as a question of law the trial court's "ultimate characterization of property as community or separate" de novo. Id. at 876.

Yegorova first argues that she is entitled to credit for the premarital earnings she put toward the purchase of the house. We disagree.

Dubinin testified that he and Yegorova "pooled" their savings together to purchase the house. Whatever amount Yegorova contributed to the down

payment and escrow for the house from her premarital income, this money was deposited into Dubinin's bank account, along with Dubinin's contribution and his parents' gift, for the purchase of the house after their wedding. The house was purchased in Dubinin's name and he secured the mortgage. He later quit claimed the house to the community.

Yegorova was unable to show at trial that her premarital payments for the house remained her separate property, "traceable and identifiable," in order to overcome the presumption that the house was community property.

Yegorova next argues she is entitled to credit for the cash gift from her mother that she used to remodel the house and condo. We disagree.

At trial, Yegorova presented a notarized gift letter from her mother—dated September 10, 2012—stating that Iryna Yegorova had given her daughter a sum of $50,000 as a gift toward the purchase of the Bellevue house. Yegorova remodeled the house and condo, which she paid in cash. Yegorova testified that in 2014 her mother gave her another sum of $30,000 in cash for the purchase and remodel of the condo. Yegorova's mother testified that both the $50,000 and the $30,000 were from the sale of the mother's home in Ukraine in 2012. The mother testified that she did not give Yegorova any additional money other than

the $50,000 in 2012[9] and $30,000 in 2014.  The mother also clarified that the

$30,000 was not a gift; it was her money to pay for a condo for herself.

Dubinin disputed Yegorova's claims about receiving any gift money from

her mother.  He presented a 2012 letter addressed to the Ukrainian Embassy

that Yegorova would be responsible for her mother's living and medical expenses

during her visit to Washington State.  He also produced a 2016 affidavit signed

by Yegorova stating that she would support her mother to obtain housing by

providing annual gifts.  Dubinin called additional witnesses, Yegorova's former

friends, to testify that Yegorova's mother was poor, requiring government

assistance for her living expenses and that Yegorova never mentioned any gifts

from her mother.

After all evidence had been presented, the trial court did not find

Yegorova's claims about her mother's cash gifts to be credible.  The trial court

concluded:

> The Court rejects [Yegorova's] argument that the funds invested in
> the house and the condo, as well as the cash found in the house,
> belonged to [her mother]. [Yegorova and her mother's] story about
> how the grandmother sold her house in Russia, brought the money
> over personally to the United States, and gave the money to
> [Yegorova] lacks credibility. All the contemporaneous evidence
> shows that [Yegorova's mother] did not play a role in the purchase
> of the properties or provide cash. In fact, the evidence showed that
> [Yegorova] vouched for [her mother] to come to the US (Ex. 160)

---

[9] In Yegorova's pre-trial deposition which was admitted at trial, Yegorova said her mother gifted her $50,000 in cash in 2005, which she kept at home in her closet and never deposited in a bank.

> and she also executed a gift affidavit (Ex. 156) stating that [Yegorova] was going to support [her] with annual gifts of $8,400. The evidence showed that [Yegorova] was paying for [her mother's] medical expenses and that [her mother] qualified for Section 8 subsidized housing for the use of the condo. Furthermore, unlike [Dubinin's] parents, who executed gift letters, no such evidence existed for the [Yegorova's mother]. Finally, as [Dubinin's] counsel pointed out, the timeline of the grandmother's alleged travel to the US to babysit the yet unborn child supports the finding that the grandmother's testimony regarding the alleged funding of [Yegorova's] real estate purchases lacks credibility.[10] It is far more credible that the mother, who admittedly had a penchant for cash dealings, is the owner of the cash, which therefore constitutes community property.[11] The Court finds that the funds used to purchase the properties did not belong to the grandmother and were therefore community property.

We defer to a trial court's assessment of witness credibility. In re Marriage of Rockwell, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). Based on the record before it, the trial court did not find credible the testimony about the existence of the cash gifts from the mother to Yegorova. It was Yegorova's burden to overcome the presumption of community property, and offer clear and convincing evidence that a property was obtained with separate funds.

---

[10] We note that it is not necessarily unusual for family members to move in anticipation of caring for a future grandchild. In fact, Dubinin acknowledged that his wife told him her mother encouraged her to go ahead and start trying to conceive because Yegorova's mother could help at any time. However, it is apparent from the record that this was not the only basis for which the trial court concluded that Yegorova was not a credible witness.

[11] Yegorova correctly points out that cash transactions can be the norm in some cultures. However that does not change the trial court's authority to evaluate the credibility of witnesses based on in-court testimony. During trial, the court also questioned Yegorova's credibility on the basis that Yegorova admitted she did not report all her cash earnings on her federal income tax filings.

We conclude that substantial evidence supports the trial court's finding that Yegorova did not prove that her separate funds were used to purchase the properties or pay for any of the remodels.

### House and Condo RPAs

Yegorova next argues that the trial court erred by failing to enforce the RPAs related to the Bellevue house and condo.

Unlike prenuptial agreements, postnuptial or separation agreements are made after a couple marries. Friedlander v. Friedlander, 80 Wn.2d 293, 299, 494 P.2d 208 (1972). Spouses may enter into separation agreements providing for the "disposition of any property" such as changing the status of community property into separate property. RCW 26.09.070(1); In re G.W.-F., 170 Wn. App. 631, 638, 285 P.3d 208 (2012). Such agreements are binding unless the court finds evidence that the contract was "unfair at the time of its execution." RCW 26.09.070(3). While the trial court found that the agreements lacked consideration, that is not a dispositive determination. No consideration is required to convey real property to a spouse. Bale v. Allison, 173 Wn. App. 435, 450, 294 P.3d 789 (2013). "A trial court's decision may be sustained on any theory within the pleadings and the evidence, even if the trial court did not consider it." Matter of Marriage of Foran, 67 Wn. App. 242, 248, 834 P.2d 1081, 1085 (1992) (citing LaMon v. Butler, 112 Wn.2d 193, 201, 770 P.2d 1027; In re

Marriage of Sanchez, 33 Wn. App. 215, 217, 654 P.2d 702 (1982)).

The validity of a separation agreement is evaluated with a two-prong test. In re Marriage of Matson, 107 Wn.2d 479, 483, 730 P.2d 668 (1986); G.W.-F., 170 Wn. App. at 644-45. Under the first prong, the court must evaluate whether the agreement is substantively fair: whether the contract provides a "fair and reasonable provision" for the party not seeking enforcement. G.W.-F., 170 Wn. App. at 645. "This is entirely a question of law unless there are factual disputes that must be resolved in order for a court to interpret the meaning of the contract." In re Marriage of Bernard, 165 Wn.2d 895, 902, 204 P.3d 907 (2009) (citing Foran, 67 Wn. App. at 251 n. 7).

Under the second prong, the court must review the procedural fairness:

(1) whether full disclosure has been made by [the parties] of the amount, character and value of the property involved, and (2) whether the agreement was entered into fully and voluntarily on independent advice and with full knowledge by [both spouses of their] rights.

G.W.-F., 170 Wn. App. at 645 (quoting Matson, 107 Wn.2d at 483)). The second prong applies only when the first prong is not satisfied. Matson, 107 Wn.2d at 482. The Matson test ensures that an agreement between partners is reached "without abuse, and in particular, without any overreaching on the part of the [initiating] spouse." Id. at 485. "Analysis under this second prong involves mixed issues of policy and fact, and accordingly review is de novo but

16

undertaken in light of the trial court's resolution of the facts." Bernard, 165 Wn.2d at 903.

Although not explicit in the record, we assume that the trial court decided that the RPAs failed to pass the first prong of the two-prong test because the trial court went ahead and focused on the second prong. See Foran, 67 Wn. App. at 249 (assuming trial court decided the contract failed the first prong in the Matson test because of its focus on the second prong of the analysis). As a matter of law, by the plain terms of the RPAs, these agreements did not provide a fair and reasonable provision for Dubinin. When reviewing an agreement that attempts to eliminate community property rights, "the court must zealously and scrupulously examine it for fairness." Matson, 107 Wn.2d at 486.

RPA1 required Dubinin, upon closing, to immediately quit claim one-half of his interest in the home to Yegorova.[12] In addition, the agreement required, upon legal separation or divorce, that Yegorova would receive payment of one-half of the current equity in the home along with her initial $50,000 contributions as referred to in the agreement. Aside from the fact that the trial court found Yegorova did not establish she contributed $50,000 of her separate property toward the purchase or remodel of the home, even if she had, this agreement would have given Yegorova three-quarters of the interest in the community

---

[12] Nothing in the record suggests that Dubinin executed a quit claim deed giving up half his interest after closing.

property in addition to $50,000. RPA1 was not substantively fair to Dubinin.

RPA2 required Dubinin, upon legal separation or divorce, to quitclaim any and all his interest in the condo to Yegorova in consideration of an "anticipated" contribution of $50,000 toward the down payment and remodeling costs. Again, this agreement was signed after the couple already purchased the condo. Requiring Dubinin to convey the entire community property was not substantively fair to Dubinin. Also, the trial court found Yegorova did not prove she contributed $50,000 toward the condo.

Most importantly, the trial court found Dubinin's testimony to be credible and Yegorova's testimony lacking in credibility as it related to the real estate agreements. The trial court concluded that the RPAs related to the house and the condo were invalid in part because Yegorova exerted undue influence over Dubinin at the time he signed the agreements. We agree.

Undue influence involves "unfair persuasion that seriously impairs the free and competent exercise of judgment." In re Est. of Jones, 170 Wn. App. 594, 606, 287 P.3d 610 (2012). A finding of undue influence would fall under the second prong of the Matson test as to whether a person entered into an agreement voluntarily. Dubinin provided substantial evidence during the dissolution proceedings that he did not enter into the RPAs voluntarily.

While Yegorova had the assistance of an attorney to prepare and review

18

the RPAs, Dubinin had an hour or two between being unexpectedly presented with the agreements and signing them.  He testified that he merely "scanned" both of the RPAs because he did not have enough time to read them.  Each time he was presented with an RPA he was confused and asked questions that Yegorova did not answer.

When Yegorova asked Dubinin to sign RPA1 the day after they already closed on the house, Dubinin asked his wife what the numbers meant, but Yegorova would not answer his questions and instead said she needed to protect herself in case Dubinin wanted a divorce.  This confused Dubinin even more.  He testified, "I'm thinking I just got married, I'm not—I'm not getting divorced.  Why else —would I marry if I'm thinking about divorce?"  But Yegorova would not address his questions and would start "bombarding" him with something else.  Dubinin testified that "[s]he's not going to leave me alone for sure.  I know Natalya.  So she's following me, she's [sic] keeps bombarding me.  Okay.  You now, just sign and get it out of my face."

Dubinin also provided testimony of Yegorova's undue influence with regard to RPA2.  Dubinin stated that during the signing of the RPA for the condo, Yegorova resorted to verbal abuse to compel him to sign:

> [She was] increasing the pressure, you know, now the names are flying around, right, idiot . . . all kinds of stuff flying around.  And this paper, it's not like no longer the focus.

19

. . .

What can I do?  I can't just walk away, she's following me.  You know, she's continuing her aggression.  You know, even if there's a lull, kind of, in the fight, she, you know, picks it back up, you know, in 5 minutes, right.  So it's never ending, you know, stressor I guess, right.  And she keeps drilling this . . . [saying] [y]ou're nothing.

He testified that Yegorova "demand[ed] and "press[ed]" him to sign the documents immediately and afforded him no opportunity to consult with an attorney or be left alone to review the documents.

Dubinin's testimony was echoed by his therapist who testified that Dubinin suffered from adjustment disorder with mixed emotional features, meaning he had some depression and some anxiety, and that this was a result of having difficulties in his relationship with his wife.  The therapist testified that Dubinin was unable to emotionally handle the stress of the marriage, and that his "biggest objective was to keep the peace" to avoid Yegorova's anger.  He was "extremely open to persuasion out of his fear," fearful his wife would become very angry if he did not agree to sign her agreements.  Yegorova's former friends testified that Yegorova married Dubinin because he was younger and "easier to manipulate" and that Yegorova was "controlling."  The psychotherapist testified, "I don't think emotionally he was able to handle it very well.  I think it had a very strong effect on him emotionally where maybe another person it wouldn't affect them so

20

deeply."[13]

This is not a case where one party makes an unsupported allegation against their spouse. Expert testimony provided evidence of the circumstances under which Dubinin felt compelled to sign the RPAs. The emotional power dynamic between the husband and wife was not equal. Dubinin, given his diagnosis, had difficulty handling his wife's anger and criticism so much so that he succumbed to pressure to sign the RPAs. This is particularly concerning where his wife prepared and reviewed the documents with an attorney, but did not suggest Dubinin seek advice of counsel. Instead, she pressured him to sign with little time to review the documents even for himself or to answer his questions.

Based on this record, Dubinin signed the agreements without meaningful opportunity to consider them and under a great amount of pressure from Yegorova to do so. Dubinin did not enter the RPAs fully and voluntarily, and the trial court did not err by concluding the RPAs were invalid.

Quit Claim Deed for the House

The trial court did not make a specific finding as to the quit claim deed,

---

[13] Dubinin also testified, and the psychotherapist confirmed, that Dubinin was extremely concerned about keeping the peace with his wife and avoiding divorce because he believed he was not in a position to be in another relationship due to health reasons. From Dubinin's perspective, this was a motivation to sign RPA2 and the quit claim deed.

finding only that the two real estate agreements were invalid. Based on the record and briefing, it appears the parties are proceeding under the assumption the trial court also found the quit claim deed invalid because it declared the condo as community property. Regardless, we can affirm the trial court's judgment on any basis supported by the record. In re Marriage of Raskob, 183 Wn. App. 503, 515, 334 P.3d 30 (2014). The quit claim deed was defective for similar reasons as the RPAs: it was signed under undue influence from Yegorova.

Yegorova claimed Dubinin saw the document the night before signing it at the notary. Dubinin testified that the first time he saw the document was at the notary's office. The trial court found Dubinin more credible than Yegorova. By both accounts he had less than a day to review and did not consult with an attorney. Dubinin testified that similarly to the RPAs he merely "scanned" the quit claim deed before signing it. Unlike the RPAs, Dubinin admitted that he told the notary he understood what signing the quit claim deed meant. However, Dubinin considered the quit claim deed the furtherance of the RPA2 that he had already signed where he had agreed to convey all of his interest in the condo upon legal separation or divorce.

Regardless of Dubinin's knowledge of what he was signing, Dubinin testified in his admitted deposition that he would have signed "anything that

22

would get me — get her off my back and stop the abuse and save the marriage." He further testified that "during these specific instances, it was just a hurricane of accusations, bullying, and calling me names." "She demands this right here and it's — and the pain is going to go away after this signature." "I felt very defeated." We also observe that Yegorova knew Dubinin was seeing a psychotherapist at the time she presented the quit claim deed and did not advise him to seek counsel from his own attorney.

Similar to the RPAs, the record establishes that Dubinin did not sign the quit claim deed fully and voluntarily. The quit claim deed was void from the inception and that the trial court did not err by refusing to enforce it and declared the condo as community property.

Attorney Fees

Dubinin requests attorney fees and costs on appeal. He argues that he is entitled to attorney fees and costs under RCW 4.84.330 because the RPAs provided for the award of attorney fees to the prevailing party in a dispute. Yegorova counters that if the RPAs are unenforceable, then all provisions of the RPA, including the attorney fee provision, are unenforceable.

A contract's invalidation does not prevent a court from awarding attorney fees to a prevailing party.

The RPAs attorney fee provisions state:

> Should any litigation be commenced between the parties hereto, the prevailing party in such litigation shall be entitled, in addition to such other relief as may be granted, to a reasonable sum for its attorney's fees and court costs in such litigation, and any appeal thereof, which shall be determined by the court in such litigation[.]

RCW 4.84.330 provides:

> [W]here such contract or lease specifically provides that attorneys' fees and costs, which are incurred to enforce the provisions of such contract or lease, shall be awarded to one of the parties, the prevailing party, whether he is the party specified in the contract or lease or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements.

The Washington Supreme Court has ruled that "[a]ttorneys fees and costs are awarded to the prevailing party even when the contract containing the attorneys fee provision is invalidated." Labriola v. Pollard Grp., Inc., 152 Wn.2d 828, 839, 100 P.3d 791 (2004). Though the trial court properly found that the RPAs were invalid, Dubinin is still entitled to seek attorney fees and costs for this appeal according to attorney fee provisions in the RPAs.

We affirm the trial court and award attorney fees and costs on appeal to Dubinin, subject to his compliance with RAP 18.1(d).

_____, J.

WE CONCUR:

_____        _____, J.

24